764 A.2d 378

**Gary W. LANGSTON**

v.

**Lori K. LANGSTON.**

**No. 55, Sept. Term, 2000.**

Court of Special Appeals of Maryland.

Dec. 29, 2000.

**208**

Jo Benson Fogel (Farida Moreau Robinson, on the brief), Rockville, for appellant.

Allen J. Kruger, Laurel, for appellee.

Argued before HOLLANDER, THIEME,* KRAUSER, JJ.

HOLLANDER, Judge.

This alimony modification dispute arises from an in banc review conducted by a three-judge panel of the Circuit Court for Montgomery County, pursuant to Maryland Rule 2–551, reversing the circuit court. The panel majority concluded that the separation agreement executed by Gary W. Langston, M.D., appellant, and Lori K. Langston, appellee, did not

---

* Thieme, J. participated in the hearing and conference of this case while an active member of this Court; he participated in the adoption of this opinion as a retired, specially assigned member of this Court.

authorize appellant unilaterally to reduce his alimony payments because of his decline in income, nor did it permit retroactive modification of appellant's alimony obligation to a date preceding his filing of a petition requesting modification. From the in banc decision, appellant timely noted this appeal. He presents one question for our review, which we have divided into two questions and rephrased:

I. Does the separation agreement permit appellant unilaterally to modify his alimony obligation, without a court order, because of a decline in income?

II. Does the a) separation agreement or b) Maryland law permit retroactive modification of an alimony obligation to a date preceding the filing of a petition for modification?

For the reasons that follow, we answer questions I and II(a) in the negative, and question II(b) in the affirmative. Therefore, we shall affirm in part, vacate in part, and remand for further proceedings.

## FACTUAL SUMMARY

The parties were married in Montgomery County on November 7, 1988, and separated on January 8, 1997. In between, the couple had four children, born between 1989 and 1995. Following their separation, the parties executed a Voluntary Separation and Property Settlement Agreement dated April 1, 1997, which was subsequently amended, on grounds not pertinent here, by the Amendment to Voluntary Separation Agreement, dated March 30, 1998 (collectively, the "Agreement"). The Agreement was incorporated, but not merged, into the Judgment of Absolute Divorce dated March 30, 1998, and docketed on April 3, 1998.

The Agreement obligates Dr. Langston to pay alimony for a total of ten years, beginning on April 1, 1997. Pursuant to the terms of the Agreement, Dr. Langston was supposed to pay monthly alimony of $8,000 for a two-year period, through March 31, 1999, with the amount of alimony decreasing thereafter and terminating after the tenth year. The amount of

spousal support was calculated based on appellant's annual income of $751,219.00 in the "base year" of 1996. If all of the alimony payments were made in accordance with the original terms of the Agreement, Dr. Langston would pay total alimony in excess of $750,000 over the ten-year period.

Modification of alimony is governed by Section V of the Agreement. Paragraph C of Section V is at issue here. It states:

> *The alimony provisions of this paragraph are subject to the further order of the court and may be modified AS TO AMOUNT ONLY* based proportionally on any increase or decrease in the Husbands [sic] gross income using calendar year 1996 as a base year. The alimony provisions with respect to terminating events or date may not be modified by any court of competent jurisdiction.

(Emphasis added).

Just one month after the parties' divorce, Dr. Langston's attorney advised Ms. Langston's attorney, by letter dated May 4, 1998, that appellant had experienced a substantial decrease in income and had decided to reduce his alimony payment. The letter stated, in relevant part:

> As your client is aware, Dr. Langston has suffered a serious loss in income as a result of his losing major clients. Pursuant to paragraph VC of the parties agreement. [sic]
>
> As you can see from the enclosed 1996 Tax return Dr. Langston's gross income in 1996 was $751,219. His Gross income in 1997 was $4876,393. [sic] His projected 1998 Gross income from all sources ... is expected to be $205,000.

> * * *

> Dr. Langston has provided Mrs. Langston with the payment that he could make, and he will continue to make the payment of $2,160. His 1998 income is projected to be 27% of his 1996 income.

\* \* \*

It is my hope that the parties can agree on this reduction *without application to the court* so that further expense and stress can be avoided. Please let me know at your earliest convenience.

(Emphasis added).

Ms. Langston did not respond to the letter. Instead, on June 16, 1998, she filed a Motion for Contempt, claiming that appellant failed to pay alimony as required by the Agreement. According to appellee, she received only $2663.00 in May, and appellant thus owed an additional $5337.00 for the month.

Dr. Langston filed an opposition to the contempt motion on August 18, 1998, claiming that he had experienced a substantial decrease in income and lacked the ability to comply with his alimony obligation. He explained that he was paying 33% of the negotiated alimony amount, despite earning only 27% of his 1996 income, on which his alimony obligation was based. Appellant added: "[Dr. Langston] is finalizing a Counter–Motion for Modification of Alimony to be filed in these proceedings."

A month later, on September 18, 1998, Dr. Langston filed a Counter–Motion for Modification of Alimony. He averred that, due to "a material change in circumstances," he was earning only 27 percent of his 1996 income and lacked the ability to make the required alimony payments. Further, appellant said that, prior to the proceedings, he had asked Ms. Langston to "agree to a modification of the alimony award, pursuant to the terms of their [A]greement and without the necessity of Court intervention." In his attached Financial Statement, filed under oath, Dr. Langston listed monthly income of $11,250 and expenses of $14,928, including monthly alimony payments of $2475. In her response, Ms. Langston asked the court to deny Dr. Langston's request. She acknowledged, however, that appellant had contacted her to request a modification of his alimony payments, but she claimed he "provided no documentation to support that request."

At the circuit court hearing on January 29, 1999, the parties advised the trial judge that they had reached an agreement regarding appellant's prospective alimony obligation, and therefore were proceeding only with respect to the dispute concerning "the interpretation" of the Agreement and "the issue of arrearages." Specifically, based on Dr. Langston's representation that his income for 1998 was $152,699, the parties agreed that he would pay $1697.60 in alimony for February and March of 1999, and $1273 per month thereafter. The parties also agreed that if Dr. Langston's income changed by more than 10 percent, he would notify Ms. Langston of the change in order for the parties to make "an upward or downward adjustment" in alimony. The adjusted alimony payment would commence at the time of notice, and neither party would be required "to come to the court for an order of modification." Therefore, no evidence was presented as to appellant's income. Nevertheless, the parties continued to disagree about: 1) whether appellant had the right under the Agreement to resort to self help by reducing his alimony obligation unilaterally, without a court order; and 2) the effective date of any modification of alimony.

Pursuant to Md.Code (1999 Repl.Vol.), § 8–103 of the Family Law Article ("F.L."), appellant urged the court to abide by the parties' Agreement, which he said did not require appellant to obtain court approval for the alimony reduction, and instead allowed appellant unilaterally to decrease his alimony, using 1996 as "the base year." If a court order were required, Dr. Langston argued that the court should retroactively reduce his alimony obligation to a date prior to when he filed his petition for modification, because that would be consistent with the time when his decrease in income actually occurred and with the Agreement.

Ms. Langston disagreed, arguing that § V.C. of the Agreement did not authorize Dr. Langston "to unilaterally reduce the support." Rather, she claimed that appellant was required to obtain relief from the court before reducing support, and that neither the Agreement nor Maryland law permitted a reduction retroactive to a date prior to the time that Dr.

Langston filed a petition requesting modification. Therefore, she sought total arrearages in excess of $20,000 for the period from May 1998 (when appellant first reduced the amount of alimony) through September 1998 (when appellant filed a petition for modification of alimony).

The trial court agreed with Dr. Langston's interpretation of § V.C. The court stated, in relevant part:

I have considered Paragraph V(c) [sic] in the parties' agreement and I think it doesn't specifically state it, but it is certainly inferred and I think common sense would indicate that the parties would have the right to reach any agreement they could reach between themselves without having to come to court and ask the court to modify their agreement.

Further, I believe that the meaning of this paragraph as it applies to the issue here is that if Dr. Langston is able to establish by the evidence the date of the decrease in his gross income, and it is the date of the decrease that is issued for modification purposes and it is not affected by when he filed with the court, so I would accept the argument of [Dr. Langston] on that issue.

Accordingly, the court entered an order dated March 8, 1999, ruling that it "finds that the meaning" of § V.C., "as it applies to the issue of arrearages, is that the date of the decrease for modification is not affected by when [Dr. Langston] filed with the court." Therefore, the court granted appellant's motion for modification without assessing any arrearages. The order was amended on March 23, 1999, on grounds not relevant here.

Ms. Langston subsequently filed a request for In Banc Review, pursuant to Maryland Rule 2–551, stating that "[t]he sole issue in this case is whether [Dr. Langston] is entitled to reduce his alimony payments to [Ms. Langston] retroactive to a date prior to his filing a Court pleadings [sic] seeking such relief." In her view, a modification could only be made retroactive to the date that appellant filed a petition seeking modification. In his opposition, Dr. Langston again asserted

that § V.C. of the Agreement permitted him to modify his alimony obligation based on his change in income, without having to seek court relief to do so. He asserted that "the date of the modification of the amount of [Dr. Langston's] alimony payment is dictated by the terms of the parties' Agreement.... without application to the Court, [so] the modification is not limited to the date of the filing of [Dr. Langston's] request."

At the in banc hearing on November 19, 1999, the parties again advanced their respective positions. To support her contention that appellant could not unilaterally modify his alimony payment, Ms. Langston's attorney relied on the language of the Agreement, which provided that alimony was modifiable pursuant to "further order of the Court." Further, appellee's lawyer said: "We are not suggesting that this [A]greement precludes modification.... What we are saying is that the Court could not permit the retroactive modification of the alimony prior to the actual filing of a motion seeking that relief."

Appellant conceded that the Agreement did not expressly provide for modification of alimony retroactive to a date prior to filing a petition to modify alimony. Nevertheless, Dr. Langston insisted that the Agreement provided for a "built in reduction ...", and claimed that "there is no requirement that either party come to Court." The following colloquy between the in banc panel and counsel for Dr. Langston is informative:

JUDGE PINCUS: Where is the language which says it is retroactive prior to the date of filing of the petition to modify the alimony? Where does it say that?

[APPELLANT'S COUNSEL]: It doesn't say that, Your Honor.

JUDGE PINCUS: I know.

[APPELLANT'S COUNSEL]: But—but the plain meaning of the words—you are saying that the parties had to have intended that there be an affirmative requirement to do that, and—and it doesn't say it, so there is no requirement that either party come to Court.

It says—it really—

JUDGE PINCUS: But it is just like any other case, if they want to modify it—

[APPELLANT'S COUNSEL]: Right.

JUDGE PINCUS:—by consent they can, but in the event one party has to come to Court, which is what happened in this case, how do you make that leap that it is retroactive prior to the filing of the petition?

[APPELLANT'S COUNSEL]: Because there is a provision, there is a built in reduction that says it may be modified, and then it tells everybody—it tells the parties how you do it.

JUDGE PINCUS: What the formula is.

* * *

[APPELLANT'S COUNSEL]: So to require him to come to Court, to file this, to do all those things when it is not in the agreement that he must do it, and then say, "Well, you can't have a reduction till you do this, even though your agreement says it—it—it may be modified."

JUDGE PINCUS: It may be, but it doesn't—

[APPELLANT'S COUNSEL]: Right.

JUDGE PINCUS:—say anything about if he has to come to Court that it is retroactive prior to the date of filing.

* * *

JUDGE PINCUS: . . . I fail to see where [the Agreement] says it [is] retroactive prior to the date of filing of the petition.

[APPELLANT'S COUNSEL]: Why does it have to say that? . . .

JUDGE PINCUS: Because that is the law.

[APPELLANT'S COUNSEL]: [I]t isn't the law, Your Honor, as to the interpretation of the contract, and the fact that this contract doesn't have those [words], you are . . . rewriting the contract.

JUDGE PINCUS: No, I am not. I am trying to read it as it exists.

[APPELLANT'S COUNSEL]: Well, if you read it as it exists, there is no word anywhere that says . . . you cannot have a reduction pursuant to the formula.

JUDGE PINCUS: It should have . . . been written that way.

[APPELLANT'S COUNSEL]: It wasn't . . .

\* \* \*

[APPELLANT'S COUNSEL]: . . . [B]ut I think that the fact that it is not in there—you are requiring that it be in there, and you have a contract without it in there, and you may not like it, and you may think it doesn't make—it is not a good procedural thing to do, but the fact is that it is a way by which parties can regulate a major decrease in income without the assistance of the court.

\* \* \*

JUDGE SCRIVNER: But they can always do that. . . .

\* \* \*

JUDGE SCRIVNER: Every case in the State can . . . agree to change their agreement.

JUDGE PINCUS: Except—except in this case you cannot—the Court cannot modify a termination event.

[APPELLANT'S COUNSEL]: Exactly.

JUDGE PINCUS: . . . or . . . a date may not be modified . . .

A divided in banc panel reversed the trial court's decision. Speaking for the majority, Judge Scrivener stated, in relevant part:

Maryland case law and Maryland statutes govern support and modification of support, and the law provides that parties to a divorce can enter into agreements as to support and modification of support, and in certain cases those

agreements would supersede what the law otherwise provides.

Unless the parties contract otherwise, the law provides that support is modifiable. In my opinion—the majority opinion is that under the terms of these parties['] agreements, the only part of the law that they address was to limit the circumstances under which a Court could consider a modification of this support provision, that circumstance being a change in his income, and the wording is, I believe, as to changes in his income only—other changes and circumstances that might have occurred, for instance if she had had an increase or a decrease in income or a fatal illness or any other number of things.

The parties contracted away any jurisdiction on the part of the Court to consider a modification of this support. . . . [I]f one party . . . wanted to extend the duration or shorten the duration, this Court would not have jurisdiction to do that. They contracted that away.

*If the parties had said in this agreement that a change in the support would be automatic, based on changes in his income, that would be one thing, but this agreement does not say that changes in support are automatic.*

It provides specifically that it is subject to further order of Court and that a Court may modify—that is not an automatic modification—though Maryland law is that a Court cannot modify support prior to the filing of a petition to do so, and nothing in this agreement changes that.

In other words, they didn't contract away that provision of the law by making it automatic based on certain things.

*So it is the opinion of the majority that the Court did not have the jurisdiction to modify the amount of support prior to the filing of a petition requesting the Court to do so.*

(Emphasis added).

Thus, the in banc review panel upheld the modification of appellant's alimony obligation, but determined that the modification was only retroactive to the date appellant filed his petition to reduce alimony, and not to an earlier date when he

suffered a decline in income. Therefore, by order dated January 28, 2000, the court ordered Dr. Langston to pay alimony arrearages in the amount of $29,200.00 for the period May 1998 through September 1998.

We shall include additional facts in our discussion.

### DISCUSSION

### I.

We begin with a review of the procedural posture of this case, in order to clarify the applicable standard of our review and the standard of review that governed the in banc panel.

■ Upon motion made within ten days of entry of judgment, Maryland Rule 2–551 provides for in banc review, as guaranteed by Article IV, § 22 of the Maryland Constitution. An in banc court acts as an appellate tribunal with respect to the circuit court. *See Board of License Comm'rs for Montgomery County v. Haberlin,* 320 Md. 399, 406, 578 A.2d 215 (1990); *Estep v. Estep,* 285 Md. 416, 421, 404 A.2d 1040 (1979); *Azar v. Adams,* 117 Md.App. 426, 434, 700 A.2d 821 (1997), *cert. denied,* 348 Md. 332, 703 A.2d 1264 (1998); *Green v. State,* 96 Md.App. 601, 606, 626 A.2d 975, *cert. denied,* 332 Md. 702, 632 A.2d 1208 (1993). Thus, its function is to review the findings and rulings of the trial judge. *Dabrowski v. Dondalski,* 320 Md. 392, 395–96, 578 A.2d 211 (1990) (per curiam); *see Haberlin,* 320 Md. at 407, 578 A.2d 215; *Estep,* 285 Md. at 420–421, 404 A.2d 1040.

■ In *Dabrowski,* 320 Md. at 395, 578 A.2d 211, the Court recognized that "the decision of the court in banc [is] a final order appealable to the Court of Special Appeals under Maryland Code (1974, 1989 Repl.Vol.), § 12–301 of the Courts and Judicial Proceedings Article and Art. IV, § 22, of the Maryland Constitution." As the Court in *Estep* explained: "[T]he court in banc acts only as an appellate tribunal so that its decisions are not those of a reconsidering trial court but are reviewable as final appellate judgments." *Estep,* 285 Md. at 421, 404 A.2d 1040; *see Montgomery County v. McNeece,* 311

Md. 194, 200, 533 A.2d 671 (1987); *Dean v. State,* 302 Md. 493, 497, 489 A.2d 22 (1985) (recognizing that there is no "different standard of appealability to a court in banc from that to the Court of Special Appeals."). Nevertheless, under Md. Rule 2–551(h), "any party who seeks and obtains [in banc] review under this Rule has no further right of appeal." This means that the decision of an in banc panel may not be appealed by the party who sought in banc review.

In their briefs, neither side addressed the standard of review that applies here, or that governed the in banc review panel. For example, the parties have not discussed whether the in banc panel, given its appellate role, was bound by the rules and practices that generally govern appellate review, requiring it to uphold factual findings of the circuit court that are not clearly erroneous, and to uphold the trial judge's discretionary decisions in the absence of abuse of discretion. Nor have the parties attempted to elucidate for us whether we must review the record and decision of the in banc court, the trial court, or both. In response to our inquiry at oral argument, appellant's counsel merely urged us to review the trial judge's decision, while appellee's lawyer counseled us to review the in banc panel's decision.

We look to *Azar,* 117 Md.App. 426, 700 A.2d 821, for guidance. There, we considered, *inter alia,* the "scope" of our review of an in banc court's decision. *Id.* at 433, 700 A.2d 821. The *Azar* Court sought to resolve whether the Court reviews only the action of the in banc court on the record before it, or the findings of the trial court on its record, or both. Writing for the Court, Judge Cathell thoughtfully analyzed the in banc process, but acknowledged that he found no cases "delineating or limiting the scope of our review" of an in banc proceeding. *Id.* at 432, 700 A.2d 821. In analyzing Rule 2–551(h), the *Azar* Court observed, 117 Md.App. at 433, 700 A.2d 821:

> This rule does not resolve the quandary, i.e., are we, when reviewing a decision of an *in banc* court, limited to the record presented to the *in banc* court, or may we consider the transcripts, pleadings, and evidence from the trial court proceedings. We have found no rule governing the scope of

our review of an *in banc* court's action. An *in banc* court is, however, an appellate tribunal. It is subordinate to this Court just as we are subordinate to the Court of Appeals. When the appellate process commences via the *in banc* court route, that court is, as to this Court, in the case where an appellee at the *in banc* level files a further appeal, an intermediate appellate court. That fact, however, also offers little help in resolving what it is that we are reviewing and what constitutes the record upon which our review is to be based. The issue is whether our review is limited to the record before the *in banc* panel or whether we may review the entire record of the trial court proceedings.

In regard to the standard of review applicable to the in banc court's consideration of the trial court's rulings, Judge Cathell explained:

An appeal to an *in banc* panel is an alternative avenue of appellate review. The forum may be different, but the restraints upon the process are the same. Neither the *in banc* panel nor we may relevantly ask whether we would have reached the same decision as that reached by the circuit court. Neither it nor we have any independent or *de novo* fact-finding responsibility or prerogative. As to fact finding, we should both be concerned only with whether [the trial judge] was legally in error.

*Id.* at 434, 700 A.2d 821 (quoting *General Motors Corp. v. Bark,* 79 Md.App. 68, 70–71, 555 A.2d 542 (1989)).

Fortunately for the *Azar* Court, it did not have to resolve the "quandary" that it identified. It said, at 117 Md.App. at 434–35, 700 A.2d 821:

Thankfully, we need not now resolve that difficult question [of what this Court must review in an appeal from an in banc panel]. We perceive that if we are reviewing the decision of the *in banc* court on either the evidence before it or the evidence as supplemented by additional portions of the trial court record presented to us, its decision was appropriate. Alternatively, based upon the portions of the trial court record presented in the extract, if we are merely

repeating an appellate review of the trial court's action, we hold that it erred. . . .

■■ We conclude from *Azar*, and the cases on which it relied, that the in banc panel functions like an intermediate appellate court. This means that it must review the circuit's factual findings and discretionary rulings. But, it may not set aside factual findings of the trial court unless clearly erroneous, nor disturb the trial judge's discretionary rulings absent a finding of abuse of discretion. The in banc panel does not make *de novo* factual findings, however. Moreover, like any appellate court, the in banc panel does not defer to the circuit court with respect to questions of law, just as we do not defer to a lower tribunal's resolution of a legal question.

■■ We also rely on *Azar* to explain our role. If the in banc panel functions like an intermediate appellate court, then our role is akin to the Court of Appeals, in the sense that we provide an additional level of appellate review. We reason by analogy to those cases that are tried in the circuit court and then reviewed by this Court and later by the Court of Appeals. When issues are raised on appeal concerning a trial court's factual findings, which are first considered by this Court and then by the Court of Appeals, the Court of Appeals essentially reviews our review of the factual findings made by the circuit court as the original tribunal. (Peeling the layers of an onion seems like an apt description here.) In the process, the Court of Appeals must also examine the trial court's decision. Similarly, in our review of the in banc panel's opinion addressing an issue about the factual findings of the circuit judge, we assess the correctness of the in banc panel's ruling by analyzing the factual findings of the circuit judge in light of the record. In the same way, when an appeal from an in banc panel concerns an issue regarding a discretionary ruling of the trial judge, we must consider the in banc panel's review of the trial judge's discretionary ruling. But, this necessarily requires us to consider the trial judge's exercise of discretion, for we must be satisfied that the trial court

properly exercised its discretion and did not abuse its discretion.

In the case *sub judice*, we are not required to determine whether any factual findings were clearly erroneous. That is because the material facts that were presented were not in dispute. On the other hand, as our discussion, *infra*, indicates, we are not satisfied that all material facts were presented. Nor are we called upon to determine if the circuit judge properly exercised his discretion. That is because he did not exercise his discretion. But, as we discuss, *infra*, we believe the case ultimately turns on the exercise of discretion.

 In any event, we are satisfied that the in banc panel correctly construed the Agreement with respect to appellant's contention that the Agreement authorized him to modify unilaterally his alimony obligation; we agree with the in banc panel that the Agreement does not permit Dr. Langston to reduce his alimony obligation without a court order. We also concur with the in banc panel that the terms of the Agreement do not permit modification of alimony retroactive to a date preceding the filing of a request. Therefore, we reject the trial judge's conclusion to the contrary. To be sure, the parties could have included such terms in their Agreement, but they failed to do so.

 We disagree, however, with the in banc panel's conclusion that Maryland statutory law bars modification of alimony retroactive to a date preceding the filing of a request. Although that view seems to be the general perception among lawyers and the bench, we believe that Maryland law makes such a determination a matter for the trial court in the exercise of its discretion. Because the trial judge failed to exercise that discretion, we shall remand for further proceedings, in order to permit the trial court to establish the effective date for modification of appellant's alimony. We explain.

## II.

The primary source of discord concerns § V.C. of the Agreement. As we noted, appellant maintains that the terms

of this provision did not require him to obtain the court's permission before reducing his alimony payment due to his change in financial circumstances. Appellant asserts:

The parties ... agreed ... that [they] may themselves modify the amount of alimony based proportionally on any increase or decrease in the Husband's gross income using calendar year 1996 as a base year. There is nothing in the parties' Agreement that requires either party to apply to the court for permission prior to making the contemplated recalculation and modification. If it was the parties' intention that one of them must make request to the Court, that term would have been included in their Agreement.

Ms. Langston argues that the Agreement did not permit appellant to bypass the court and decide for himself that he qualified for a reduction in alimony. Further, appellee maintains that neither the Agreement nor applicable Maryland law entitled appellant to modification of alimony retroactive to a date preceding his petition requesting modification. Thus, she claims that the in banc panel properly construed § V.C. of the Agreement when it determined that Dr. Langston owes arrearages for the period from May to September 1998.

The Agreement was incorporated but not merged into the divorce decree. The provisions of a separation agreement that are incorporated but not merged into a divorce decree may be enforced as an independent contract. *Schneider v. Schneider,* 335 Md. 500, 516, 644 A.2d 510 (1994); *see* F.L. § 8-105(a)(2); *see also* John F. Fader, et al., *Maryland Family Law* § 13-8, at 586 (2nd ed.1995). Thus, the Agreement is subject to the same general rules of construction applicable to other contracts. *Bruce v. Dyer,* 309 Md. 421, 433, 524 A.2d 777 (1987); *Goldberg v. Goldberg,* 290 Md. 204, 212, 428 A.2d 469 (1981); *Fultz v. Shaffer,* 111 Md.App. 278, 298, 681 A.2d 568 (1996).

A fundamental principle of contract construction requires that we give effect to the intention of the contracting parties, unless that intention is at odds with an established principle of law. *Hartford Accident & Indem. Co. v. Scarlett*

*Harbor Assocs. Ltd. P'ship,* 109 Md.App. 217, 290–91, 674 A.2d 106 (1996), *aff'd,* 346 Md. 122, 695 A.2d 153 (1997). Moreover, "the primary source for determining the intention of the parties is the language of the contract itself." *Hartford Accident & Indem.,* 109 Md.App. at 290–91, 674 A.2d 106 (citations omitted). Contracts are construed "as a whole to determine the parties' intentions." *Sullins v. Allstate Ins. Co.,* 340 Md. 503, 508, 667 A.2d 617 (1995). Additionally, we construe words in a contract consistent with their usual and ordinary meaning, unless it is apparent that the parties ascribed a special or technical meaning to the words. *Id.; see Cheney v. Bell Nat'l Life Ins. Co.,* 315 Md. 761, 766, 556 A.2d 1135 (1989).

Contracts are, however, subject to the law of objective interpretation. *See Auction & Estate Representatives, Inc. v. Ashton,* 354 Md. 333, 340, 731 A.2d 441 (1999); *Calomiris v. Woods,* 353 Md. 425, 435, 727 A.2d 358 (1999); *Adloo v. H.T. Brown Real Estate, Inc.,* 344 Md. 254, 266, 686 A.2d 298 (1996). This means that the clear and unambiguous language of a written agreement controls, even when the language is not congruent with the parties' actual intent at the time of the creation of the contract. *Ashton,* 354 Md. at 340, 731 A.2d 441; *Bruce v. Dyer, supra,* 309 Md. 421, 433, 524 A.2d 777; *Kasten Constr. Co., Inc. v. Rod Ent., Inc.,* 268 Md. 318, 328, 301 A.2d 12 (1973) (stating that "where a contract is plain and unambiguous, there is no room for construction, and it must be presumed that the parties meant what they expressed."); *Nicholson Air Servs., Inc. v. Board of County Comm'rs,* 120 Md.App. 47, 63, 706 A.2d 124 (1998); *Baltimore Gas & Elec. Co. v. Commercial Union Ins. Co.,* 113 Md.App. 540, 554, 688 A.2d 496 (1997). It follows that the true test of what is meant is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought the agreement meant. *Calomiris, supra,* 353 Md. at 436, 727 A.2d 358; *see Feick v. Thrutchley,* 322 Md. 111, 115, 586 A.2d 3 (1991); see also *General Motors Acceptance Corp. v. Daniels,* 303 Md. 254, 261, 492 A.2d 1306 (1985); *Aetna Cas. & Sur. Co. v. Ins. Comm'r,* 293 Md. 409,

420, 445 A.2d 14 (1982); *Anne Arundel County v. Crofton Corp.,* 286 Md. 666, 673, 410 A.2d 228 (1980). The Court of Appeals explained in *Calomiris:*

"In these circumstances, the true test of what is meant is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant. Consequently, the clear and unambiguous language of an agreement will not give away to what the parties thought that the agreement meant or intended it to mean."

*Calomiris,* 353 Md. at 436, 727 A.2d 358 (quoting *General Motors Acceptance Corp.,* 303 Md. at 261, 492 A.2d 1306).

▮▮▮▮ When a contract is ambiguous, "the meaning of the contract is a question to be determined by the trier of fact." *University of Baltimore v. Iz,* 123 Md.App. 135, 162, 716 A.2d 1107, *cert. denied,* 351 Md. 663, 719 A.2d 1262 (1998); *see Shapiro v. Massengill,* 105 Md.App. 743, 754–55, 661 A.2d 202, *cert. denied,* 341 Md. 28, 668 A.2d 36 (1995). Contractual language is considered ambiguous "if, when read by a reasonably prudent person, it is susceptible of more than one meaning." *Calomiris,* 353 Md. at 436, 727 A.2d 358; *accord Ashton,* 354 Md. at 340, 731 A.2d 441; *Heat & Power Corp., v. Air Prods. & Chems., Inc.,* 320 Md. 584, 596, 578 A.2d 1202 (1990); *see Pacific Indem. Co. v. Interstate Fire & Cas. Co.,* 302 Md. 383, 389, 488 A.2d 486 (1985)(stating that language "may be ambiguous if it is 'general' and may suggest two meanings to a reasonably prudent layperson"). In *Calomiris,* the Court explained that "[t]he determination of whether language is susceptible of more than one meaning includes a consideration of 'the character of the contract, its purpose, and the facts and circumstances of the parties at the time of execution.'" 353 Md. at 436, 727 A.2d 358 (quoting *Pacific Indem.,* 302 Md. at 388, 488 A.2d 486).

▮▮▮▮ Of significance here, the determination of contractual ambiguity is a threshold question of law, subject to *de novo* review by this Court. *Ashton,* 354 Md. at 341, 731 A.2d 441; *Calomiris,* 353 Md. at 434, 727 A.2d 358; *JBG/Twin-*

*brook Metro Ltd. P'ship v. Wheeler,* 346 Md. 601, 625, 697 A.2d 898 (1997) ("The interpretation of a written contract is ordinarily a question of law for the court."). In deciding whether a contract is ambiguous, "the court is confined to a review of the contract language itself." *Iz,* 123 Md.App. at 162, 716 A.2d 1107; *see McIntyre v. Guild, Inc.,* 105 Md.App. 332, 355, 659 A.2d 398 (1995).

Ordinarily, because we give "legal effect to the clear terms of a contract," the terms may not be contradicted by extrinsic or parol evidence of prior or contemporaneous agreements. *Calomiris,* 353 Md. at 432, 727 A.2d 358. But, when the terms of a contract are ambiguous, "extrinsic and parol evidence may be considered to ascertain the intention of the parties." *Sullins,* 340 Md. at 508, 667 A.2d 617; *see Calomiris,* 353 Md. at 433, 727 A.2d 358 ("All courts generally agree that parol evidence is admissible when the written words are sufficiently ambiguous."); *Kendall v. Nationwide Ins. Co.,* 348 Md. 157, 170, 702 A.2d 767 (1997); *Pacific Indem. Co.,* 302 Md. at 389, 488 A.2d 486; *Son v. Margolius, Mallios, Davis, Rider & Tomar,* 114 Md.App. 190, 213, 689 A.2d 645 (1997) ("[W]hen a written agreement is ambiguous, a court must resort to the rules of contract construction and may also consider extrinsic evidence."), *reversed on other grounds,* 349 Md. 441, 709 A.2d 112 (1998).

The standard of review that applies to the lower court's ruling on ambiguity differs from the standard that governs factual findings based on parol evidence after the court has determined that the contract language is ambiguous. "[O]n appeal, *de novo* review applies to the initial determination of whether contractual language is ambiguous, and the clearly erroneous standard comes into play only after the trial court's finding of ambiguity is upheld." *Calomiris,* 353 Md. at 435, 727 A.2d 358. Stated otherwise, if the trial court finds that a contract is ambiguous, and if we agree with the trial court's finding of ambiguity, we will apply a clearly erroneous standard to the trial court's construction of the contract in light of the parol evidence received.

Apparently, the trial court did not consider the Agreement ambiguous. The judge said: "I think common sense would indicate that the parties would have the right to reach any agreement they could reach between themselves without having to come to court and ask the court to modify their agreement ... [I]t is the date of the decrease that is used for modification purposes and it is not affected by when he filed with the court." Although the trial court acknowledged that the Agreement "doesn't specifically" allow modification to a date prior to the filing of the petition, the judge believed it was "certainly inferred." In a two to one decision, the in banc panel also considered the Agreement unambiguous, but reached the opposite conclusion as to the meaning of the contract.

As we observed, the threshold question of ambiguity is a question of law. Upon review of the Agreement, we agree with the in banc panel that the Agreement is not ambiguous with respect to the issue of whether appellant had the right to reduce his alimony obligation on his own, without first obtaining a court order. We see no basis in the Agreement for the strained conclusion that § V.C. authorized appellant to decide for himself whether he suffered a material change in circumstances sufficient to warrant a reduction in alimony. In reaching that conclusion, we rely on the terms of the Agreement, which expressly states that the alimony provisions "are subject to the further order of the court and may be modified AS TO AMOUNT ONLY." That language plainly indicates that the parties contemplated court approval for a change in the *amount* of alimony.

As we indicated, we are also equally satisfied that the in banc panel correctly concluded that the language of the Agreement does not provide for modification of alimony retroactive to the date when appellant first sustained a decrease in income. In this regard, we observe that the Agreement does not make any mention whatsoever authorizing such modification. The reference in § V.C. to 1996 as the "base year" for purposes of determining the proportional increase or decrease in alimony does not mean that the parties agreed that every

modification would automatically be retroactive to 1996. If that were the case, the Agreement would be no agreement at all. In effect, it could be rescinded long after it became effective.

Appellant relies on *Shapiro v. Shapiro*, 346 Md. 648, 697 A.2d 1342 (1997), to support his contentions. There, the Court considered F.L. § 8–103(c) and determined that the General Assembly did not intend "to prevent parties, by contract, from excepting themselves under specified conditions, as opposed to universally, from modifiability." *Id.* at 658, 697 A.2d 1342. Appellant's reliance on *Shapiro* is misplaced. The issue here is not whether the parties had the right to make a contract that linked alimony modification to the date of a decline in income. *See* F.L. § 11–101(c). The question is whether they did so.

## III.

Although we have established that the terms of the Agreement do not sanction unilateral modification by appellant of his alimony obligation, or modification retroactive to 1996 or some other date prior to the filing of a request, those determinations do not resolve the matter entirely. The absence of a contract clause expressly permitting reduction of alimony retroactive to a date prior to the filing of a request is not dispositive, because the question remains as to whether the court had the discretion, under Maryland law, to modify alimony retroactive to a date when appellant's income first decreased, even if that date preceded the filing of a formal modification request. We think that it did.

At oral argument, appellee relied on F.L. § 11–101 for the proposition that, absent an agreement between the parties, the court may not retroactively modify alimony to a date prior to a request submitted to the court. Although that is the general view among the bench and bar, we have not found any statutory basis or decisional law to support that perception.

Title 11 of the Family Law Article governs alimony. F.L. § 11–101 concerns an initial award of alimony and states, in part: [1]

### § 11–101. Award—In general.

(a) *Where available.*—The court may award alimony:

(1) on a bill of complaint for alimony; or

(2) as a part of a decree that grants:

(i) an annulment;

(ii) a limited divorce; or

(iii) an absolute divorce.

\* \* \*

(c) *Effect of agreement.*—If a final disposition as to alimony has been made in an agreement between the parties, the court is bound by that agreement as the agreement relates to alimony.

Thus, under F.L. § 11–101(c), the court is "bound" by the terms of any agreement between the parties with respect to alimony. Here, as we have seen, the Agreement does not speak to retroactivity.

F.L. § 11–106 is also relevant. Effective October 1, 1984, it was added to the Family Law Article, pursuant to Chapter 213 of Acts of Maryland (1984). F.L. § 11–106 says, in part:

### § 11–106. Same—Determination of amount and duration.

(a) *Court to make determination.*—(1) The Court shall determine the amount of and the period for an award of alimony.

(2) *The court may award alimony for a period beginning from the filing of a pleading that requests alimony.*

---

1. The Family Law Article was originally enacted by Chapter 296 of Acts of 1984. F.L. § 11–101 replaced Md. Ann.Code (1957 Code, 1981 Repl.Vol.), Art. 16, § 1(a). That section provided, in part:

**§ 1. Award when divorce, annulment or alimony granted.**

(a) *Award.*—In granting a limited or absolute divorce, annulment, or alimony, the court may award alimony to either party, and the existence of a ground for divorce against the party requesting alimony shall not be an automatic bar thereto. However, if a final

(Emphasis added). Thus, with respect to an initial alimony award, it is clear, by statute, that the date of the filing of a request is critical.

Modification of alimony, however, is governed by other portions of the Family Law Article. F.L. § 11–107 is relevant. It states, in part:

**§ 11–107. Extension of period; modification of amount.**

* * *

(b) Modification of amount.—Subject to § 8–103 of this article and on the petition of either party, *the court may modify the amount of alimony awarded as circumstances and justice require.*

(Emphasis added).

F.L. § 8–103 is also pertinent. It provides:

**§ 8–103. Modification of deed, agreement, or settlement.**

* * *

(b) *Exception for provision concerning support of a spouse.*—The court may modify any provision of a deed, agreement or settlement with respect to spousal support executed on or after January 1, 1976, regardless of how the provision is stated, *unless there is a provision that specifically states that the provisions with respect to spousal support are not subject to any court modification.*

(c) *Certain exceptions for provision concerning alimony or support of spouse.*—The court may modify any provision of a deed, agreement, or settlement with respect to alimony or spousal support executed on or after April 13, 1976, regardless of how the provision is stated, unless there is:

(1) an express waiver of alimony or spousal support; or

---

disposition has been made as to alimony in another agreement, the provisions of that agreement shall control.

(2) a provision that specifically states that the provisions with respect to alimony or spousal support are not subject to any court modification.

(Emphasis added).

In addition, we must consider F.L. § 8–105. It says:

**§ 8–105. Power of court to enforce or modify provisions.**

* * *

(b) *Modification*—The court may modify any provision of a deed, agreement, or settlement that is:

(1) incorporated, whether or not merged, into a divorce decree; and

(2) subject to modification under § 8–103 of this subtitle.

In general, it is well settled that the "determination of the effective date of a modification order is within the discretion of the trial court." Fader, *supra*, § 4–9(c), at 178–179. The treatise further states that it is "not an abuse of discretion for a chancellor to make alimony . . . retroactive to the date on which a petition for modification is filed. . . ." *Id.* at 179. Despite appellee's contention, however, we cannot find any statutory provision that expressly limits the court's discretionary power to *modify* alimony retroactive to a date prior to the request for modification.

To be sure, logic suggests that if an initial alimony award cannot be made retroactive to a date prior to the filing of request for alimony, then a modification of alimony cannot be made retroactive to a date that precedes the filing of such a request, unless the parties otherwise agree. On the other hand, F.L. § 11–107 expressly authorizes a modification of the "amount of alimony awarded as circumstances and justice require," without the express limitation that governs an initial alimony award. *See* F.L. § 11–106(a)(2).

We can easily envision a situation when justice and circumstances might warrant a modification to a date preceding a request submitted to the court. For example, an obligor

spouse seriously injured in a car accident, languishing in a hospital and unable to work, might not be in a position to request a modification of alimony, while failing to make payment after payment. By the time a request is finally submitted to the court, the payor spouse may have accumulated substantial arrears, with no prospect of suitable employment. In that circumstance, the court, in its discretion, might opt to reduce the past due alimony payments, which the statute does not preclude. Even if the statutory gap or omission in the modification provision was inadvertent, however, it is the Legislature's function, not ours, to remedy it.

We have found only one case in the past 25 years that sheds any light on the precise issue raised here. The case supports the view that the court has discretion to modify alimony retroactive to a date prior to the actual request. In *Levin v. Levin*, 60 Md.App. 325, 482 A.2d 935 (1984), we addressed the issue of whether the trial court abused its discretion in modifying an alimony obligation retroactive to a date preceding the husband's petition to modify alimony. There, a husband and wife entered into a separation agreement, in which the husband agreed to pay the wife alimony equal to twenty-five percent of his gross "income" as defined in the agreement. Eleven years later, in May 1982, the husband retired, after receipt in April 1982 of a lump sum pension payment of $142,112.31 from his employment. Thereafter, by letter, the husband notified his former wife that his retirement terminated his alimony obligation. Consequently, the wife initiated a contempt proceeding to enforce alimony payments. Approximately eleven months after the husband received the pension funds, he filed a petition to modify his alimony obligation. At the time the husband received the pension funds, however, the original alimony order was in effect. The trial court ordered the husband to continue payment of alimony, but the court reduced the amount, effective as of his retirement months earlier.

On appeal, the wife claimed that she was entitled to the full amount of alimony due under the original order (i.e., 25% of the pension), because the husband received the funds eleven

months prior to filing a petition for modification. The Court noted that the wife "argues that the court lacked the authority to give retroactive effect to the modification order, passed on 13 September 1983, changing past due installments of the husband's alimony payments." We agreed with the trial court that the pension constituted income, but upheld the trial court's modification of alimony retroactive to April 1982, eleven months prior to the filing of the petition for modification. In reaching that result, the Court said "that the determination of the effective date of a modification order is within the discretion of the trial court," *id.* at 335, 482 A.2d 935, and noted that the wife had "overlooked ... the power of the court to do precisely what she contends it cannot do...." *Id.* at 335–336, 482 A.2d 935. Thus, we found "no abuse of discretion in the retroactivity portion of the court's order." 60 Md.App. at 336, 482 A.2d 935. The effect of the ruling was to change the amount of the husband's alimony obligation after the fact, and as of a time prior to his request for a modification.

At the time suit was filed in *Levin,* modification of alimony was governed by Md. Ann.Code (1957, 1981 Repl.Vol.), Art. 16, § 5. It said, in relevant part:

> [U]pon the motion of either party, the amount of alimony awarded under this title is subject to modification as the circumstances and justice may require.

F.L. § 11–107(b) was in effect as of October 1984, and the case was decided in November 1984. In any event, F.L. § 11–107(b) contains language that is substantively identical to the earlier statutory language.

By analogy, appellee contends that *Reese v. Huebschman,* 50 Md.App. 709, 440 A.2d 1109 (1982), and F.L. § 12–104 support her position that appellant is expressly prohibited from obtaining a modification of alimony retroactive to a date prior to his request. *Reese* concerned child support, and F.L. § 12–104(b) specifically bars retroactive modification of child support award "prior to the date of the filing of the motion for modification." Ms. Langston overlooks the express statutory provision that governs modification of child support, as well as

the strong policy considerations in favor of prohibiting retroactive modification of child support to a date prior to the actual modification request. *See Reuter v. Reuter,* 102 Md. App. 212, 240–41, 649 A.2d 24 (1994).

Because we find no statutory support for appellee's claim that the effective date of alimony modification may not precede the actual filing of a request, it follows that the in banc panel erred in concluding that, as a matter of law, the court cannot make a modification retroactive to a date prior to the filing of a request. The question of retroactivity is one for the trial judge, in the exercise of discretion.

In this case, the trial court did not exercise discretion in making the alimony modification retroactive, because he erroneously determined that the parties agreed upon modification retroactive to the time when appellant's income declined. Moreover, appellant did not present evidence, apart from the agreed upon reduction in income, to justify a court ordered modification retroactive to May 1998, when he first reduced his alimony payment. Therefore, we shall remand this matter to the court for further proceedings, in order for the court to decide, in its discretion, the effective date of the modification of alimony.

For the benefit of the trial court on remand, we hasten to add that, in exercising its discretion in matters of this kind, a trial judge should be wary of permitting a modification of alimony retroactive to a date that precedes a request to the court. As we see it, principles of equity require compelling circumstances to justify such a request. This is because modification of alimony retroactive to a date that precedes the request could cause extreme hardship to the payee spouse, whose first notice of a problem may come only with the petition. By that time, the payee spouse probably would have incurred expenses or made expenditures based on alimony payments already received, or overdue but nonetheless anticipated in the future. It is the filing of a modification request that ordinarily alerts the payee spouse that a change may be in the wind. By then, it would be too late for the

payee spouse to cancel or adjust expenses already incurred. Moreover, as a matter of policy, unless such rulings are founded on extreme hardship, the court would act to encourage the kind of "self help" by an obligor spouse that we ought not to countenance, absent an agreement between the parties.

**JUDGMENT OF THE IN BANC REVIEW PANEL AFFIRMED IN PART AND VACATED IN PART. CASE REMANDED TO THE TRIAL COURT FOR FURTHER PROCEEDINGS. COSTS TO BE DIVIDED BETWEEN THE PARTIES.**