782 A.2d 377

Jeffrey FANTLE

v.

Judy FANTLE.

No. 1138, Sept. Term, 2000.

Court of Special Appeals of Maryland.

Sept. 27, 2001.

---

Kevin I. Kane (Kane & Associates, Chartered on the brief), Bethesda, for appellant.

No brief or appearance by appellee.

Argued Before HOLLANDER, KRAUSER and RAYMOND G. THIEME, JR. (Retired, specially assigned), JJ.

KRAUSER, Judge.

We are asked to resolve the issue of whether voluntary overpayments of alimony may be applied to subsequent under-payments of alimony that were in violation of the parties' property settlement agreement and the court order incorporating that agreement. In this case, appellant, Jeffrey Fantle, voluntarily made overpayments of alimony to his former wife, appellee, Judy Fantle, and then, when his financial circumstances deteriorated, reduced his payments to an amount less than that required by the parties' property settlement agreement and ordered by the Circuit Court for Montgomery County. Five months after appellee demanded that appellant resume making the full payments originally ordered by the court, appellant filed a petition to modify alimony, and appellee countered by filing a motion to hold appellant in contempt for the underpayments of alimony.

In granting appellee's motion in part, the circuit court held that appellant could not lawfully apply overpayments in alimony to subsequent arrearages, as there had been no formal "court order or agreement" modifying the parties' property settlement agreement to "satisfy a reduction in the amount of [appellant's] arrearage." It therefore entered a judgment in favor of appellee and against appellant in the amount of $16,400 in underpaid alimony. From that judgment, appellant noted this appeal.

Appellant presents the following issues, which we have reworded and reordered to facilitate our review:

I.     Whether the circuit court erred in holding that appellant was not entitled to apply prior overpayments of alimony to later underpayments of alimony.

II.    Whether appellee's agreeing to or acquiescencing in appellant's request to lower his monthly alimony pay-

ments precludes appellee from later claiming an arrearage during that period of acquiescence.

III. Whether appellee failed to establish by clear and convincing evidence that appellant's excess alimony payments to appellee were "gifts."

IV. Whether the circuit court erred in prohibiting appellant from testifying as to why he overpaid alimony from September 1995 through December 1997.

■ For the reasons° that follow, we shall vacate the judgment of the circuit court because it erred in concluding, as a matter of law, that in the absence of a formal "court order or agreement" it had no discretion to apply prior overpayments of alimony to subsequent underpayments and because it erroneously prohibited appellant from testifying as to his reasons for making those overpayments. That testimony would no doubt have shed light on whether the overpayments were intended as a gift or otherwise. Because we shall vacate the circuit court's judgment on those grounds and remand this case for further proceedings consistent with this opinion, we shall not address the remaining issues, except to the extent we believe it will be helpful to do so for the guidance of the circuit court.

## BACKGROUND

Appellant and appellee were married on January 14, 1973, and separated seventeen years later on February 23, 1990. The parties subsequently entered into a property settlement agreement ("Agreement"). That Agreement required appellant to pay appellee monthly alimony of $2,500 from March 1994 through August 1995.

On April 11, 1994, the Circuit Court for Montgomery County granted the parties a Judgment of Absolute Divorce. Their property settlement agreement was incorporated but not merged into that decree. Beginning September 1995, the Agreement reduced appellant's alimony payments to $2,000 per month for the remainder of appellant's payment obligation.

Despite this reduction, appellant continued to pay appellee $2,500 per month from September 1995 through November 1997, resulting in an overpayment of $13,500.[1] According to appellant, he had overpaid his alimony obligation because "Judy needed the money, and ... [h]e was making enough money" at that time to do it. At the hearing on this matter, however, appellant was denied the opportunity to expand on this explanation by the court.

According to appellant, his financial circumstances began to deteriorate in February 1997, and in August 1998 appellant requested that appellee permit him to reduce his monthly alimony obligation from $2,000 to $1,000. Appellant testified that appellee "was unhappy, but she agreed to [the reduction]." Beginning August 1998, appellant reduced his payments to $1,000 per month.

In a letter dated April 23, 1999, to appellant, appellee wrote:

I agreed to accommodate your cash flow needs for a period of time because you willingly paid me $500 more each month for a year or so shortly after the divorce to help me through a financially difficult time. So I extended the same courtesy to you. However, as I explained to you last week, I can no longer afford to do this because of the financial strain it is causing me.

In that letter, appellee demanded that appellant resume making alimony payments of $2,000 per month. Despite appellee's demand, appellant continued to pay only $1,000 per month.

On October 7, 1999, appellant filed in the Circuit Court for Montgomery County a petition to modify alimony, and on December 13, 1999, appellee filed a motion to hold appellant in

---

1. According to appellant's brief, the $13,500 represents the difference between the amount of alimony owed pursuant to the parties' Judgment of Absolute Divorce for the period of September 1995 through December 1997 ($2,000 per month for 28 months totaling $56,000) and the amount of alimony paid by appellant to appellee during this same period ($10,000 in 1995, $30,000 in 1996, and $29,500 in 1997 totaling $69,500) ($69,500–$56,000 = $13,500).

contempt for having failed to pay his $2,000 monthly alimony obligation since August 1998.

On June 2, 2000, after finding that appellant had suffered an "approximately 60 percent" reduction in income, the circuit court granted appellant's petition to modify alimony and reduced his monthly alimony obligation from $2,000 to $1,200. The court, however, denied appellee's motion to hold appellant in contempt, explaining: "I do not find that Mr. Fantie's actions have been contemptuous. I think he showed good will in paying more money when he had it and feels that he did not have the money to maintain the $2,000.00, and I cannot find that that is contemptuous." Nonetheless, the court granted a judgment in favor of appellee in the amount of $16,400, representing the alimony appellant had underpaid from August 1998 through May 2000.

## DISCUSSION

Appellant argues that the circuit court erred in ruling that he was not entitled to apply overpayments of alimony to later underpayments of alimony. In so ruling, the circuit court stated that, in the absence of a formal "court order or agreement" modifying the parties' Agreement, appellant could not lawfully apply the overpayments to subsequent arrearages and that it lacked the discretion to find otherwise. The trial court further explained, "unless there is a written agreement modifying [the parties' agreement], I think any payments over and above what appellant was required to make would not be recouped in this type of action." As the court did not believe it had the discretion to retroactively apply overpayments to past due underpayments of alimony, it did not consider the arguments advanced by appellant for doing so, namely, that appellee had either agreed to the reduction or at least acquiesced to it or had in effect waived her claim to the difference between the reduced payment and the court-ordered payment. Nor did the court consider, we should add, appellee's claim that the overpayments were intended as a gift.

■ We begin our analysis by noting that this Court recently held that Maryland statutory law does not "bar modification of alimony retroactive to a date preceding the filing of a request." *Langston v. Langston,* 136 Md.App. 203, 222, 764 A.2d 378 (2000), *cert. granted,* 363 Md. 661, 770 A.2d 169 (2001). And the retroactive modification of alimony is "a matter for the trial court in the exercise of its discretion." *Id.*

In *Langston,* this Court considered whether Dr. Langston could, without a court order but allegedly in accordance with his separation agreement, unilaterally reduce his alimony payments to Mrs. Langston, because of a diminution in income. We also considered the larger question of whether Maryland law permits a court to modify retroactively alimony payments to a date preceding the filing of a request for modification. In that case, we held that the language of the Langstons' separation agreement contemplated court approval of any change in the amount of alimony. As for the trial court's right to reduce pre-petition alimony, we held that not only does Maryland law not prohibit such a reduction but in fact the trial court possessed the discretion to do so under Maryland Code (1984, 1996 Repl.Vol., 2000 Supp.), § 11–107(b) of the Family Law Article. That provision provides that "[s]ubject to § 8–103 ... the court may modify the amount of alimony awarded as circumstances and justice require." We further held that although the parties' separation agreement "does not provide for modification of alimony retroactive to the date when [Dr. Langston] first sustained a decrease in income," *id.* at 227, 764 A.2d 378, the court may exercise its discretion and retroactively modify an alimony obligation. We cautioned, however, that because such a modification could "cause extreme hardship to the payee spouse," for whom it was "too late ... to cancel or adjust expenses already incurred," *id.* at 234–35, 764 A.2d 378, the trial court "should be wary of permitting" retroactive modification of alimony. Indeed, we added that "principles of equity require compelling circumstances to justify such a request." *Id.* at 234, 764 A.2d 378.

As in *Langston,* there is nothing in the parties' Agreement that would prohibit a retroactive modification of alimony.

Paragraph 12(c) of the Agreement addresses the question of modification by simply stating that "[a]limony as set forth herein shall be modifiable technically, but shall not be subject to extension." Nor, as we observed in *Langston,* is "the absence of the contract clause expressly permitting reduction of alimony retroactive to a date prior to the filing of a request ... dispositive...." *Id.* at 228, 764 A.2d 378. Indeed, under F.L § 11 107(b), the court has the discretion to modify alimony retroactively "as circumstances and justice require."

Unfortunately, the court below did not have the *Langston* case before it when it ruled, as that case was decided six months later. It therefore erroneously held that it could not retroactively modify appellant's alimony obligation, notwithstanding its finding that appellant had suffered a substantial decline in income, constituting "a material change in circumstances." *Id.* at 227, 764 A.2d 378.

Nor, unaccountably, did the court consider whether the parties by words or deeds, impliedly or expressly, had modified the Agreement, reducing appellant's alimony obligation until appellee's letter of April 23rd demanding resumption of full monthly payments. It is well settled that parties to a written contract that is not governed by the Statute of Frauds may orally modify the terms of that contract even if the " 'written contract provides that it shall not be varied except by an agreement in writing....' " *Hoffman v. Glock,* 20 Md.App. 284, 288, 315 A.2d 551 (1974)(quoting *Freeman v. Stanbern Const. Co.,* 205 Md. 71, 79, 106 A.2d 50 (1954)); *see also Essential Housing Dev. Inc., v. Landev Invests., Inc.,* No. 98–1563, 1999 WL 1134548, at *5, 1999 U.S.App. LEXIS 32480, at *18 (4th Cir. Dec. 13, 1999)(quoting *Freeman,* 205 Md. at 79, 106 A.2d 50). Compounding this error, the circuit court prohibited appellant from explaining the reasons for his prior overpayments, as reflected in the following testimonial excerpt:

[MR. KANE]: And what was the purpose of the additional payment?

[MR. FANTLE]: She still needed the money.

[MR. KANE]: Okay. And what was your intent with that—in paying her this additional money?

[MR. STEIN]: Objection.

[THE COURT]: Sustained.

We can only surmise that had appellant been permitted to testify, he might have presented sufficient evidence upon which the court might have found that appellee had either agreed to, acquiesced in, or waived the difference between the reduced and court ordered payments. In that event, the court could have, in its discretion, applied the overpayments to the arrearages without ever having to address the question of judicial modification.

▆▆▆▆ To establish waiver, for example, there must be a voluntary "relinquishment of a known right, or such conduct as warrants an inference of the relinquishment of such right, and may result from an express agreement or be inferred from circumstances." *Food Fair Stores, Inc. v. Blumberg*, 234 Md. 521, 531, 200 A.2d 166 (1964). However, the "intention to waive must be clearly established and will not be inferred from equivocal acts or language." *Charles J. Frank, Inc. v. Associated Jewish Charities of Baltimore, Inc.*, 294 Md. 443, 449, 450 A.2d 1304 (1982) (citing *BarGale Indus., Inc. v. Robert Realty Co., Inc.*, 275 Md. 638, 644, 343 A.2d 529 (1975)).

As noted earlier, in her April 23, 1999 letter to appellant, appellee acknowledged that she had "agreed" to accept the reduced alimony payments to "accommodate" appellant because he had assisted her during a "financially difficult time." In that letter, appellee wrote:

> I agreed to accommodate your cash flow needs for a period of time because you willingly paid me $500 more each month for a year or so shortly after the divorce to help me through a financially difficult time. So I extended the same courtesy to you. However, as I explained to you last week, I can no longer afford to do this because of the financial strain it is causing me.

Nor did she dispute at trial that she voluntarily cashed appellant's checks, as reflected in the following testimony:

[MR. KANE]: And then from August of 1998 through—do you have Defendant's Exhibit 10 [appellee's letter] in front of you?

[MS. FANTLE]: Yes.

[MR. KANE]: What is the date you sent that letter?

[MS. FANTLE]: April 23rd, 1999.

[MR. KANE]: Okay. So, for the period of [August through April of 1999]—for a nine month period, you *voluntarily* cashed his $1,000 checks; did you not?

[MR. STEIN]: Objection—

[THE COURT]: Overruled.

[MR. STEIN]:—to the word "voluntary."

[THE COURT]: Well, I think she testified that—I am sure nobody held a gun to her head and made her cash them.

\* \* \*

[MR. STEIN]: And we don't object to the fact that she cashed the checks.

We further note that at the time of the reduction, appellant did not offer nor did appellee apparently request that he make up the difference at some later date. In fact, in appellee's letter of April 23rd to appellant, she demands that he resume making the full court-ordered payments but does not request he pay any arrearages. Given these facts, and perhaps others that appellant was prevented from testifying to, if the court had considered this issue it might have concluded that appellee voluntarily "relinquishe[d] a known right" to the arrearages during this period. *Food Fair Stores, Inc.*, 234 Md. at 531, 200 A.2d 166 (1964).

■■■ Alternatively, the court could have found from the evidence admitted and the unadmitted testimony of appellant that the parties had in fact modified the agreement themselves. It is well settled that parties to a contract "may agree to vary its terms and enter into a new [agreement] embodying

the changes agreed upon and a subsequent modification of a written contract may be established by a preponderance of the evidence." *Cole v. Wilbanks*, 226 Md. 34, 38, 171 A.2d 711 (1961). Nor must that agreement necessarily be in writing or expressly stated. " 'Assent to an offer to vary, modify or change a contract may be implied and found from circumstances and the conduct of the parties showing acquiescence or agreement.' " *Edell & Associates, P.C. v. Law Offices of Peter G. Angelos*, No. 00–2069, 264 F.3d 424, 440, 2001 U.S.App. LEXIS 19038, at *40–41 (4th Cir. August 24, 2001)(quoting *Cole v. Wilbanks*, 226 Md. at 38, 171 A.2d 711). Moreover, once a party has accepted the performance of an oral agreement, "neither consideration nor a writing is necessary." *Software Clearing House, Inc. v. Intrak, Inc.*, 66 Ohio App.3d 163, 583 N.E.2d 1056, 1061 (1990)(citing *Morrison v. Devore Trucking, Inc.*, 68 Ohio App.2d 140, 428 N.E.2d 438, 441 (1980)("[S]ubsequent acts and agreements may modify the terms of a contract. . . .")).

In sum, the court had before it, had it chosen to consider this issue, evidence from which it could have found an express or implied agreement to modify the alimony obligation of the Agreement: "implied" in that the parties, without ever expressing it in words, may have had a tacit understanding that each would help the other by either increasing or decreasing payments as circumstances warranted; "express" in that the April 23rd letter and oral communications between parties may have constituted a verbal modification of appellant's alimony obligation.

We caution, however, that we are not suggesting that the court, after these issues have been fully presented on remand, will necessarily conclude that the appellee waived her claim to the alimony arrearages to the extent of the overpayment or that the parties had agreed to modify the Agreement to provide for a reduction in alimony during the period in question. In fact, on remand, the court may determine, as appellee contends, that the overpayments were a "gift," and therefore appellant must pay the full amount of the arrearages.

There are three elements of a gift: 1) donative intent, 2) actual delivery by donor, and 3) acceptance by the donee. *Dorsey v. Dorsey*, 302 Md. 312, 318, 487 A.2d 1181 (1985). "The burden," however, "is on the donee to establish every element of a gift" by "clear and convincing evidence." *Id.* To prove donative intent, "it must be shown from the evidence that the donor clearly and unmistakably intended to permanently relinquish all interest in" the gift. *Id.* (citing *Schilling v. Waller*, 243 Md. 271, 276–77, 220 A.2d 580 (1966)). Once evidence is adduced establishing all three elements, a valid gift is presumed in the absence of evidence to the contrary. *Dorsey v. Dorsey*, 302 Md. 312, 318, 487 A.2d 1181 (1985).

In support of her claim that the overpayments were a gift, appellee relies on the following statement in Paragraph 6 of appellant's petition for modification of alimony:

> The Petitioner's overpayment of the support obligations was neither done in error nor was it a miscalculation or misunderstanding; rather, the Petitioner made a conscious, benevolent effort to assist his former wife in a time when he enjoyed financial prosperity.

To rebut appellee's claim of a "donative intent," appellant produced at the hearing below his state and federal tax returns for the years 1995 through 1997. These returns listed the monthly overpayments made to appellee as alimony, not gifts. On remand, this issue and others will be before the circuit court for its determination.

**JUDGMENT VACATED.**

**CASE REMANDED TO THE CIRCUIT COURT FOR MONTGOMERY COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.**

**COSTS TO BE PAID EQUALLY BY APPELLANT AND APPELLEE.**