808 A.2d 809

**Jane PETITTO**

v.

**Wayne F. PETITTO.**

**No. 00514, Sept. Term, 2001.**

Court of Special Appeals of Maryland.

Sept. 6, 2002.

Reconsideration Denied Nov. 15, 2002.

Cynthia E. Young, Annapolis, for appellant.

Matthews S. Walls, Frederick, for appellee.

Argued before HOLLANDER, KRAUSER and GREENE, JJ.

HOLLANDER, Judge.

This appeal arises from an action to modify child support filed by Wayne Petitto, appellee, against Jane Petitto, appellant. Among other things, we have been asked to consider whether the parties' marital separation agreement required the Circuit Court for Anne Arundel County to apply Massachusetts Child Support Guidelines in calculating appellee's child support obligation.

The parties were married and divorced in Massachusetts. In connection with their divorce, they executed an Agreement of Separation that is central to this case. It includes a provision requiring an annual recalculation of child support for

the parties' only child, Jocelyn, and another clause providing that the Agreement shall be governed by Massachusetts law.

After the divorce, appellee relocated to Virginia, while appellant and Jocelyn settled in Maryland. In late 1998, appellee filed suit in the circuit court to reduce his weekly child support obligation of $374.45. Although the parties disagree about whether appellant impeded the progress of that suit, it is undisputed that appellee's case was dismissed on November 30, 1999, because the Massachusetts divorce decree was never enrolled in Maryland. Consequently, on February 9, 2000, appellee filed a second complaint to modify child support; it is that complaint that is in contention here.

Applying the "ceiling" of the Maryland child support guidelines in this "above guidelines" case, the circuit court reduced appellee's child support obligation to $221 per week, and made the reduction retroactive to the filing of the first modification petition. As a result, appellee was relieved of arrearages of $9735.70. Moreover, the court ordered appellant to reimburse appellee for the overpayment in child support.

Unhappy with the court's disposition, Ms. Petitto noted this appeal. She presents several questions for our consideration, which we have rephrased as follows:

I. Pursuant to the parties' separation agreement, did the court err in failing to apply Massachusetts law, rather than Maryland law, in calculating appellee's child support obligation?

II. Even if the court did not err in applying Maryland law to calculate child support, did the court err or abuse its discretion in modifying and reducing child support?

III. Because appellee's first petition for child support was filed in late 1998, but was subsequently dismissed in 1999, did the trial court err in modifying child support retroactively to December 1998?

IV. Did the trial court err in finding that appellant is voluntarily impoverished?

For the reasons discussed below, we shall vacate the court's judgment and remand for further proceedings.

## FACTUAL SUMMARY

The parties were married in Massachusetts in January 1983. Their only child, Jocelyn, was born on February 14, 1984, and thus has become emancipated during the pendency of this litigation. In May 1997, while still residing in Massachusetts, the parties separated. They obtained a Judgment of Divorce Nisi (the "Judgment") in Massachusetts on August 11, 1997. Their Agreement of Separation (the "Agreement") of May 15, 1997, was made a part of the Judgment and "merged" into it. Both parties have since remarried, and appellee has a child with his current wife.

Among other things, the Agreement provided for joint legal custody of Jocelyn, with appellant having primary physical custody. Section 5.2 of the Agreement obligated appellee "to pay child support pursuant to the child support guidelines...." That provision, however, does not identify the child support guidelines of a particular state. It reads:

5.2 *Child Support. [Appellee] agrees to pay child support pursuant to the child support guidelines* commencing on the first Friday after the execution of this Agreement, and every Friday thereafter until such time as the minor child, Jocelyn[,] is emancipated as hereinafter defined.

\* \* \*

[The parties] agree that on an annual basis, commencing on or about April 15, 1998, they will exchange up-dated financial statements and re-calculate the child support guidelines based upon their current incomes.

Pursuant to the terms of the Agreement, appellee's weekly child support obligation was set at $374.45. Under § 5.6(a) of

the Agreement, appellee also agreed to pay Jocelyn's private school tuition for high school.[1]

Section 12.10 of the Agreement is also relevant. It states:

12.10 *Governing Law.* This Agreement shall be governed by, interpreted and construed according to the laws of the Commonwealth of Massachusetts without regard to its conflict of laws provisions. This Agreement has been executed and completed in Massachusetts and is a Massachusetts contract.

The master held an evidentiary hearing on August 11, 2000, with respect to appellee's petition. As of that time, appellee had not paid any child support since December 1999. Appellee argued that Maryland law should govern the court's disposition, while appellant maintained that, pursuant to the Agreement, Massachusetts law applied. The parties seem to agree that, under the Massachusetts child support guidelines, appellant would receive more money in child support than she would receive pursuant to the Maryland guidelines.

The master issued a comprehensive Report and Recommendation of November 27, 2000, in which he reviewed the evidence adduced at the hearing and made several findings of fact that are relevant here. Ultimately, the master recommended the denial of appellee's request for modification of child support, as well as the denial of attorneys' fees to both parties. We turn to consider the evidence and the master's findings.

Both parties are members of the United States Air Force. Appellant, a reservist for over 20 years, was a Major with a gross annual income of $13,255 when the Agreement was executed. She was subsequently promoted to Lieutenant Colonel, earning $1990 a month on a part-time basis. She also had monthly investment income of about the same amount,

---

1. Jocelyn attended a Catholic high school in Maryland, with an annual tuition of about $6000. Appellee acknowledged, however, that his father paid the tuition.

based on a return of $23,879 in 1998. She last worked full-time in 1977, when she earned $27,000.

Appellee was a Lieutenant Colonel when the Agreement was executed, with monthly earnings of $5917. In 1998 and 1999, he had an annual income of approximately $72,000 to $74,000. In February 2000, appellee was promoted to the rank of Colonel, and his gross annual income increased to $100,125.96, or $8343.83 per month. Including monthly investment income of $832.17, appellee earned approximately $9176 per month at the time of the hearing.

At the time of separation, the parties divided their savings. Appellant received $200,000, while appellee received $100,000. Appellant also received an additional $250,000 in 1998, when the marital home was sold. In addition, appellee acknowledged that his father "has been gifting" $10,000 per year to him.[2]

The master found that appellant, who is quite well educated, is voluntarily impoverished, as she works just six weeks a year. According to appellant's 1997 tax forms, she earned $26,156. Based upon appellant's 1997 earnings, plus interest income, the master attributed earnings to appellant of $4170 per month.

Further, the master determined that, from December 14, 1999, when appellee last paid child support, until June 20, 2000, when an Earnings Withholding Order was signed, appellee accumulated a child support arrearage of $9,735.70. Ac-

---

2. The master criticized the financial statements of both parties. As to appellee, the master noted that he did not reveal the source of his investment income. Moreover, the master said: "The expenses listed in Father's statement are either inflated or are for his entire household. For instance, the expense of $902 per month for food, etc. is clearly excessive for one person." Concerning appellant, the master said she did not furnish a "full" financial statement. The evidence showed that she had assets of $710,000 in a brokerage account, but the master regarded the source of $260,000 of that sum as a "mystery." Nevertheless, the master concluded that appellee failed to prove that appellant had income "beyond that listed in her financial statements and tax returns."

cordingly, the master proposed payment by appellee of $75.55 per week towards his arrears.

The master was of the view that the Maryland Child Support Guidelines (the "Guidelines") applied to appellee's request for modification. He reasoned:

The legal issues in this case are initially controlled by the Uniform Interstate Family Support Act. Fam. Law Article §§ 10–301, *et seq.* The present order from the Massachusetts court is controlling and must be recognized. FL § 10–310. However, Massachusetts no longer has Continuing Exclusive Jurisdiction (CEJ) because all of the individuals have left that state. *See* FL § 10–308(a)(1). Because Mother and the child now reside in Maryland, and Father has registered the divorce decree, this Court has authority to both enforce and modify that support order. FL § 10–348. Any modification of the support order is subject to the same requirements, procedures and defenses that apply to the modification of an order originally issued by this Court. FL § 10–350(d). Upon issuing an order modifying the present support order, this state will obtain CEJ. *See* FL §§ 10–308, 10–348. However, this State has no authority to modify any provision of the [Massachusetts] order that may not be modified under the law of the issuing state. FL § 350(c); *Holbrook v. Cummings*, 132 Md.App. 60, 750 A.2d 724 (2000). Nor may this State modify the provisions of the agreement which have been incorporated into the Massachusetts order. FL § 10–308(f); *see also* FL § 11–101(c) (court bound by agreement of the parties); *and see* 28 U.S.C. § 1738 (full faith and credit act).

With respect to appellee's request to reduce his child support, the master found a material change in circumstances, stating: "[T]he evidence is uncontradicted that both parents have enjoyed advancements in rank, have remarried, and have changed residences. While there may be no one event that would justify a review, all of these changes combined result in a material change in circumstances." The master added: "It is unchallenged that Father is now earning more than he was at the time of the divorce."

Based on the Guidelines, the master computed a weekly child support obligation for appellee of $196.00. As the master observed, "[t]hat sum is a significant reduction from the agreed-upon child support of $374.45 per week." Nevertheless, the master recommended the continuation of appellee's child support obligation at $374.45 per week, to maintain Jocelyn's standard of living. The master added that appellee's "decision to remarry and have a new child cannot—or at least should not—be the basis for reducing his obligation to Jocelyn."

Both parties filed exceptions to the master's recommendations, and the circuit court held an exceptions hearing on March 7, 2000. Appellant again argued that Massachusetts law applied in regard to the amount of child support. Moreover, she claimed that the master erred in finding that she was voluntarily impoverished, given that she had worked part-time for 26 years. Further, appellant noted that appellee had failed to present any evidence as to what job she was qualified to hold or what money she could earn.

Asserting that appellant is "bleeding my client dry to completely support the child," appellee's counsel urged the court to reduce the child support. He claimed that appellee was paying twice the amount of child support required under the Guidelines. Further, appellee urged the court to make the reduction in child support retroactive to December 1998, when appellee filed his first modification action. Appellee also excepted to the master's denial of attorney fees.

On March 23, 2001, the court issued its Opinion and Order, in which it expressly adopted the master's first level factual findings. The court also observed that, "strictly speaking," the Guidelines do not apply, because the parties have a combined monthly income in excess of $10,000. *See Voishan v. Palma,* 327 Md. 318, 609 A.2d 319 (1992).

The court overruled appellant's exception to the master's finding of voluntary impoverishment. Noting that appellant only earns $1,990 per month as a reservist, the court said that appellant did not present

any reason that she was unable to work more than regular reserve stint for part of each year; asked whether she had looked for other regular civilian work, she stated, without further explanation, "No, I haven't." ... This appears to be a sufficient basis for the Master to have found the mother as "voluntarily impoverished" and to impute potential income to her under Family Law Art., sec. 12–204(b).

Further, the court upheld the master's finding that appellant "apparently would be able to earn as much as she did in 1997 ($26,156), if she chose to do so, rather than choos[ing] a lifestyle of ease as she apparently has done." Including $1990 per month in investment income, the court imputed to appellant a total income of $3429.67 per month. The court also accepted the finding that appellee currently earns $9176 per month, as compared to his earnings of $5917 per month at the time of the divorce.

The court acknowledged that the Agreement provides for the recalculation of child support annually, based on "the child support guidelines" and the current incomes of the parties. The court also recognized that the Agreement provides that it is to be construed in accordance with Massachusetts law. Nevertheless, the court took "judicial notice that Massachusetts law, like Maryland law, provides that the Guidelines do not actually apply when the parties' combined gross annual income exceeds $100,000. *Cf.*, Massachusetts Ann. Laws, Sch. 208, Sect. 28, et seq." Regardless of whether Massachusetts or Maryland law applies, the court determined that it had discretion in the award of child support because this is an above guidelines case.

The court was also mindful that the master had recommended that the court "deny the father's request for modification down to the guideline range, which would reduce the originally agreed support level by nearly 50% from $374.45 to $196 per week." Significantly, the court said it agreed with the master *"that the father has offered no evidence to show how it would be in Jocelyn's best interest to have the level of support previously agreed and paid for her benefit reduced."*

(Emphasis added). Nevertheless, the court disagreed with the notion that the "agreement was one for a specific amount of support to be paid indefinitely." It reasoned that the parties' Agreement provided

> for support to be recalculated annually, as nearly as possible, consistent with the child support guidelines. Such an agreement by the parents is presumed to be in the best interests of the child absent contrary proof. E.g., *Kierein v. Kierein*, 115 Md.App. 448, at 458, 693 A.2d 1157 (1997). And, no proof was offered in this case to indicate that such an agreed modification of support within the guidelines range ('floor to ceiling') would be inadequate to the child's actual needs or prior standard of living in light of improved finances of both her parents.

Accordingly, the court rejected the master's recommendation to maintain the status quo. Instead, the court reduced appellee's weekly support obligation from $375 to $226, a sum equal to the "ceiling" of the Guidelines, in order "to give effect to the [A]greement." Moreover, the court made the reduction retroactive to December 1, 1998, when appellee filed his first petition. The effect of that ruling was to eliminate all child support arrearages.

In addition, the court ordered appellant to reimburse appellee for the overpayment of support, and to pay $1000 towards appellee's attorney's fees. Citing *Rand v. Rand*, 40 Md.App. 550, 554–555, 392 A.2d 1149 (1978), the court said that if " 'the custodial parent ... has not, in fact, expended the 'overpayment' for the support of the child and has it ... available for repayment, it is only fair and just that the paying parent be able to recover it.' " The court reasoned:

> Because of the mother's extensive assets, the undersigned does find that she has "the equivalent" of support money in her accounts which would enable her to return the overpayment which would not have been made, if the parties had made timely modification of the support obligation, as agreed.

We shall include additional facts in our discussion.

## DISCUSSION

### I.

Appellant contends that, pursuant to the terms of the Agreement, the parties agreed upon the use of the Massachusetts guidelines for purposes of calculating child support.[3] Therefore, she claims that the court erred in failing to apply Massachusetts law in calculating appellee's child support obligation.

As we observed, the parties seem to agree that, if the court had applied the ceiling of the Massachusetts guidelines, appellee's child support obligation would have been "significantly higher." Using the "minimum presumptive level under Massachusetts guidelines," appellant contends that appellee would have had a weekly child support obligation of $329.08, well in excess of the $221 per week ordered by the trial judge. In addition, appellant challenges the court's order attributing income to her. Without that income imputed to her, she claims appellee would have owed weekly child support of $447.83 under Massachusetts law.

Appellee disagrees with appellant's position, noting that the Agreement does not expressly provide for the application of the Massachusetts guidelines. Moreover, he asserts that, "on grounds of public policy," it is unsound "to impose amounts of child support arrived at by legislatures of other [s]tates upon children living in Maryland." Although appellee recognizes that "Maryland law generally allows parties to agree on the choice of law by which an agreement will be governed," he asserts:

> The Massachusetts Legislature set guidelines on the basis of support needed for children living in Massachusetts. Because Jocelyn no longer resides [in Massachusetts] and her expenses are no longer related to Massachusetts, setting child support based upon her former residence would

---

3. Appellant asserts that the Maryland Uniform Interstate Family Support Act, F.L. § 10–301 et seq., does not apply here because of the parties' Agreement. Appellee has not challenged that assertion.

be contrary to the intent of the agreement to provide support for the child. By not specifying that Massachusetts guidelines should always be used, but rather that child support should be recalculated according to [the] guidelines, *it was the intent of the parties that the appropriate guidelines should be used.*

(Emphasis added).

It is undisputed that, under both Maryland and Massachusetts law, this is an "above guidelines" case, meaning that the parties' combined, gross monthly income exceeds the upper limit to which the child support guidelines of either state apply. Therefore, the court concluded that it did not have to resolve which state's guidelines applied, because under the law of either state, it has discretion to make an appropriate award of child support. The court then established appellee's child support obligation using the "ceiling" or top of the Maryland Guidelines.

■ In our view, the trial court did not err by declining to apply the Massachusetts guidelines in regard to child support. We explain.

Maryland has long recognized that parties to a domestic case may resolve their disputes by way of separation agreements that are enforceable as independent contracts. *Langston v. Langston,* 366 Md. 490, 505, 784 A.2d 1086 (2001); *Schneider v. Schneider,* 335 Md. 500, 516, 644 A.2d 510 (1994); *Moore v. Moore,* 144 Md.App. 288, 797 A.2d 839 (2002); *Campitelli v. Johnston,* 134 Md.App. 689, 696, 761 A.2d 369 (2000), *cert. denied,* 363 Md. 206, 768 A.2d 54 (2001); *see* Md.Code (1984, 1999 Repl.Vol.), §§ 8–101, 8–105 of the Family Law Article ("F.L."); J. Fader and R. Gilbert, MARYLAND FAMILY LAW § 14–3(b)(3rd ed.2000). As the Court said in *Gordon v. Gordon,* 342 Md. 294, 675 A.2d 540 (1996): "The prevailing view is now that 'separation agreements ... are generally favored by the courts as a peaceful means of terminating marital strife and discord so long as they are not contrary to public policy.'" *Id.* at 300–01, 675 A.2d 540 (quot-

ing 5 S. WILLISTON, A TREATISE ON THE LAW OF CONTRACTS § 11:7, at 396–99 (R. Lord ed., 4th ed.1993)).

■ As a contract between the parties, such an agreement is subject to the general rules of construction applicable to other contracts. *Bruce v. Dyer,* 309 Md. 421, 433, 524 A.2d 777 (1987); *Moore,* 144 Md.App. at 303, 797 A.2d 839; *Rauch v. McCall,* 134 Md.App. 624, 637, 761 A.2d 76 (2000); *Fultz v. Shaffer,* 111 Md.App. 278, 298, 681 A.2d 568 (1996). Accordingly, the principles of contract construction are relevant to our analysis of the Agreement, although not necessarily dispositive of the issue before us.[4]

■ The construction of a written contract is a question of law, subject to *de novo* review by an appellate court. *Langston,* 366 Md. at 505–06, 784 A.2d 1086; *JBG/Twinbrook Metro Ltd. v. Wheeler,* 346 Md. 601, 625, 697 A.2d 898 (1997); *Nationwide Insurance Companies v. Rhodes,* 127 Md.App. 231, 732 A.2d 388 (1999). As a fundamental principle of contract construction, we seek to ascertain and effectuate the intention of the contracting parties. *Society of Am. Foresters v. Renewable Natural Resources Found.,* 114 Md.App. 224, 234, 689 A.2d 662 (1997); *Hartford Accident & Indem. Co. v. Scarlett Harbor Assocs. Ltd. P'ship,* 109 Md.App. 217, 290–91, 674 A.2d 106 (1996), *aff'd,* 346 Md. 122, 695 A.2d 153 (1997). Moreover, "the primary source for determining the intention of the parties is the language of the contract itself." *Hartford Accident & Indem.,* 109 Md.App. at 290–91, 674 A.2d 106. In this regard, contracts are interpreted "as a whole to determine the parties' intentions." *Sullins v. Allstate Ins. Co.,* 340 Md. 503, 508, 667 A.2d 617 (1995). The terms of a contract are construed consistent with their usual and ordinary meaning, unless it is apparent that the parties ascribed a special or technical meaning to the words. *See Fister v. Allstate Life*

---

4. The parties have not addressed the principles of contract construction under Massachusetts law. Nor have they suggested that Massachusetts principles of contract construction vary in any significant way from the principles of contract construction in Maryland. Therefore, we shall refer to Maryland principles of contract construction.

*Ins. Co.,* 366 Md. 201, 210, 783 A.2d 194 (2001); *Cheney v. Bell Nat'l Life Ins. Co.,* 315 Md. 761, 766, 556 A.2d 1135 (1989).

In ascertaining the parties' intent, Maryland follows the objective law of contract interpretation. *See Taylor v. NationsBank, N.A.,* 365 Md. 166, 178, 776 A.2d 645 (2001); *B & P Enterprises v. Overland Equip. Co.,* 133 Md.App. 583, 604, 758 A.2d 1026 (2000). Under this doctrine, when a contract is clear and unambiguous, "its construction is for the court to determine." *Wells v. Chevy Chase Bank, F.S.B.,* 363 Md. 232, 251, 768 A.2d 620 (2001) (citation omitted). Moreover, the court is required to "give effect to [the contract's] plain meaning," without regard to what the parties to the contract thought it meant or intended it to mean. *Wells,* 363 Md. at 251, 768 A.2d 620; *see PaineWebber Inc. v. East,* 363 Md. 408, 414, 768 A.2d 1029 (2001); *Auction & Estate Representatives, Inc. v. Ashton,* 354 Md. 333, 340–41, 731 A.2d 441 (1999); *Calomiris v. Woods,* 353 Md. 425, 436, 727 A.2d 358 (1999).

Generally, "it must be presumed that the parties meant what they expressed." *PaineWebber Inc.,* 363 Md. at 414, 768 A.2d 1029; *see Jones v. Hubbard,* 356 Md. 513, 533, 740 A.2d 1004 (1999). " 'If only one reasonable meaning can be ascribed to the [contract] when viewed in context, that meaning necessarily reflects the parties' intent.' " *Labor Ready, Inc. v. Abis,* 137 Md.App. 116, 128, 767 A.2d 936 (2001) (citation omitted). Thus, " 'the clear and unambiguous language of an agreement will not give away to what the parties thought that the agreement meant or intended it to mean.' " *Calomiris,* 353 Md. at 436, 727 A.2d 358 (citation omitted). The " 'test of what is meant is . . . what a reasonable person in the position of the parties would have thought' the contract meant." *Society of Am. Foresters,* 114 Md.App. at 234, 689 A.2d 662 (citation omitted).

Whether a contract is ambiguous is a threshold question of law, subject to *de novo* review by an appellate court. *Calomiris,* 353 Md. at 434, 727 A.2d 358. Contractual language is considered ambiguous when the words are suscep-

tible of more than one meaning to a reasonably prudent person. *Ashton,* 354 Md. at 340, 731 A.2d 441; *Calomiris,* 353 Md. at 436, 727 A.2d 358; *Davis v. Magee,* 140 Md.App. 635, 650, 782 A.2d 351 (2001). "The determination of whether language is susceptible of more than one meaning includes a consideration of 'the character of the contract, its purpose, and the facts and circumstances of the parties at the time of execution.'" *Calomiris,* 353 Md. at 436, 727 A.2d 358 (citation omitted). When a contract is ambiguous, "the meaning of the contract is a question to be determined by the trier of fact." *University of Baltimore v. Iz,* 123 Md.App. 135, 162, 716 A.2d 1107, *cert. denied,* 351 Md. 663, 719 A.2d 1262 (1998); *see Shapiro v. Massengill,* 105 Md.App. 743, 754–55, 661 A.2d 202, *cert. denied,* 341 Md. 28, 668 A.2d 36 (1995). A contract is not ambiguous, however, merely because the parties do not agree as to its meaning. *Fultz,* 111 Md.App. at 299, 681 A.2d 568.

■ Ordinarily, "parties to a contract may agree as to the law which will govern their transaction, even as to issues going to the validity of the contract." *General Insurance Company of America v. Interstate Service Company, Inc.,* 118 Md.App. 126, 137, 701 A.2d 1213 (1997); *see National Glass, Inc. v. J.C. Penney Properties, Inc.,* 336 Md. 606, 650 A.2d 246 (1994); *Kronovet v. Lipchin,* 288 Md. 30, 43, 415 A.2d 1096 (1980). But, in *General Insurance,* we recognized the following limitations on that right, based on the Restatement (Second), Conflict of Laws § 187 (Supp.1989):

(1) The law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue.

(2) The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either

(a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or

(b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

*General Insurance,* 118 Md.App. at 137, 701 A.2d 1213; *see National Glass,* 336 Md. at 610–11, 650 A.2d 246; (quoting Restatement (Second), Conflict of Laws § 187(2) (Supp.1989)).

Although § 12.01 of the Agreement provides that it is "governed by, interpreted and construed according to the laws of Massachusetts," it does not expressly require application of the Massachusetts guidelines. There is no language in the Agreement that requires use of the Massachusetts guidelines for the rest of Jocelyn's minority, under all conceivable circumstances, including those attendant here, where none of the parties resides in Massachusetts. Indeed, the specific provision concerning child support says nothing about the guidelines of any particular state. It states only that appellee "agrees to pay child support pursuant to the child support guidelines . . . ." Had the parties meant to require use of the Massachusetts child support guidelines under all circumstances, they could have easily said so.

Moreover, contractual language providing for the interpretation or construction of the Agreement under Massachusetts law is not the same as a provision requiring use of the Massachusetts guidelines under all circumstances. As we see it, even if Massachusetts law applies pursuant to the Agreement, the question is whether Massachusetts law would require use of the Massachusetts guidelines when neither of the parties has any current ties to Massachusetts. Appellant has not provided us with any authority to suggest that a Massachusetts court, applying Massachusetts law, would use Massachusetts guidelines in light of the facts of this case.

In any event, the canons of contract construction do not require us to abandon our common sense or logic in interpreting the Agreement or in ascertaining the parties' intent. To the extent that the parties contemplated use of the Massachusetts child support guidelines, it undoubtedly was because they lived in Massachusetts when the Agreement was executed. Putting it another way, the child support provision of the Agreement is not an open ended obligation for appellee to pay child support based on the Massachusetts guidelines if neither of the parties had any ties to Massachusetts.

We reject appellant's position for yet another reason. Regardless of the terms of the Agreement with respect to child support, the Agreement does not take priority over the best interests of the child, the standard that controls decisions affecting children. *Voishan,* 327 Md. at 326, 609 A.2d 319; *see Ley v. Forman,* 144 Md.App. 658, 672, 800 A.2d 1 (2002). Parents cannot waive or bargain away appropriate child support. *Walsh v. Walsh,* 333 Md. 492, 504, 635 A.2d 1340 (1994); *see Green v. Sollenberger,* 338 Md. 118, 130, 656 A.2d 773 (1995); *Stambaugh v. Child Support Administration,* 323 Md. 106, 111, 591 A.2d 501 (1991). "A parent has both a common law and statutory duty to support his or her minor child." *Drummond v. State,* 350 Md. 502, 520, 714 A.2d 163 (1998); *see Middleton v. Middleton,* 329 Md. 627, 633, 620 A.2d 1363 (1993); *Sczudlo v. Berry,* 129 Md.App. 529, 542, 743 A.2d 268 (1999). This policy is codified in the child support guidelines. *See* Md.Code (1999 Repl.Vol.), Title 12 of the Family Law Article; *Drummond,* 350 Md. at 520–21, 714 A.2d 163; *Tannehill v. Tannehill,* 88 Md.App. 4, 11, 591 A.2d 888 (1991).

In effect, strict adherence to appellant's position could result in the subordination of the child's best interest in favor of an agreement between the parties. It may not be in a child's best interest to construe a child support agreement in such a way as to link support to a state to which none of the parties has any present connection. For example, if the child had relocated from a state with a cost of living lower than Mary-

land's, and with child support guidelines that provided corre-spondingly less support, it would not necessarily be in the child's best interest to have a parent's support obligation limited by an agreement obligating the court to use guidelines based on the cost of living in the other state. Indeed, that position might well conflict with the public policy consider-ations that culminated in the enactment of the child support guidelines. *See Petrini v. Petrini,* 336 Md. 453, 460, 648 A.2d 1016 (1994); *Voishan,* 327 Md. at 322, 609 A.2d 319; *Jackson v. Proctor,* 145 Md.App. 76, 92, 801 A.2d 1080, 1090 (2002).

It happens that, in this case, the use of foreign guidelines might yield more child support. But, we cannot sanction a policy that permits use of foreign guidelines so long as the parent pays more support than might otherwise be required, while rejecting their use if it would result in a lower financial payment. Moreover, more can mean less; although appellant seems to suggest that it is always in a child's best interest to receive the maximum possible amount of monetary aid, that is not necessarily so. Use of the child support guidelines of a state wholly unrelated to the parties, except by an outdated agreement, could result in a financial hardship to a parent. In turn, the financial burden on a parent could have an adverse impact on the child, because a parent who is under undue financial pressure may not be able to meet a child's ongoing emotional needs, which are clearly important to the child's healthy development.

*Shrivastava v. Mates,* 93 Md.App. 320, 612 A.2d 313 (1992), illustrates the importance of the guidelines as a matter of public policy, even when the parents have reached an agree-ment as to support that is not consistent with the guidelines. There, a mother of two children filed a motion to modify child support after the child support guidelines were adopted. She and her former husband had previously executed a binding agreement as to his child support obligation. Under the guidelines, however, the appellee's support obligation would have been $1756, rather than the agreed upon sum of $695. *Id.* at 324, 612 A.2d 313. The circuit court concluded that use of the guidelines would be unjust and inappropriate, because it

would lead to a result that the parties did not "bargain for...." *Id.* at 326, 612 A.2d 313. This Court disagreed and reversed.

At the outset, the Court reiterated that the "law and the policy of this State is that the child's best interest is of paramount importance and cannot be altered by the parties." *Id.* at 327, 612 A.2d 313. Thus, the parties' Agreement as to child support, standing alone, did not justify departure from the child support guidelines. *Id.* at 330, 612 A.2d 313. Because the trial court failed to consider the impact of the parties' agreement upon the parents' financial resources, or the financial needs of the children, we said that it "elevated the parties' contractual expectations over the best interests of the children and impermissibly allowed the parties 'to agree to preclude a child's right ... to have that support modified in appropriate circumstances.'" *Id.* at 330, 612 A.2d 313 (citation omitted).

Moreover, the Court said: "The guidelines unquestionably have a significant and legitimate public purpose." *Id.* at 332, 612 A.2d 313. It added: "The fact that a particular amount of child support was negotiated by the parties ... does not necessarily mean that it is appropriate or equitable." *Shrivastava*, 93 Md.App. at 332, 612 A.2d 313. As the Court observed, "parties could not by contract bind a court to a particular amount of child support." *Id.* The *Shrivastava* Court also rejected the notion that the Legislature would have created two classes of children, based on when the child support obligation was established, "one presumptively entitled to the amount of child support calculated under the guidelines and one deprived of that right, based solely on the time of the establishment of the original child support obligation." *Id.* at 335, 612 A.2d 313.

Finally, even if a Massachusetts court would apply Massachusetts guidelines under the circumstances of this case, despite the fact that neither of the parties has any present connection to Massachusetts, we do not perceive that such a determination would fully advance appellant's position. As

the trial court noted, under both Maryland and Massachusetts law, this is an above-guidelines case. Consequently, the guidelines do not apply, either in Maryland or Massachusetts. Maryland Code (1999 Repl.Vol., 2000 Supp.), § 12–204(d) of the Family Law Article ("F.L."). *See, e.g., Jackson,* 145 Md.App. at 90, 801 A.2d 1080; *Barton v. Hirshberg,* 137 Md.App. 1, 17, 767 A.2d 874 (2001). *See also Pearson v. Pearson,* 52 Mass.App.Ct. 156, 751 N.E.2d 921, 925 (2001); *J.C. v. E.M.,* 36 Mass.App.Ct. 446, 632 N.E.2d 429, 431 (1994). In an above-guidelines case, the court must exercise its discretion in setting the amount of child support. F.L. § 12–204(d); *Jackson,* 145 Md.App. at 90, 801 A.2d 1080. *See also Richards v. Mason,* 54 Mass.App.Ct. 568, 767 N.E.2d 84, 88 (2002); *O'Meara v. Doherty,* 53 Mass.App.Ct. 599, 761 N.E.2d 965 (2002). This means that a Massachusetts court would not necessarily have awarded the "ceiling" under the Massachusetts guidelines, knowing that none of the parties resides in Massachusetts. Instead, it could have looked to the ceiling under the Maryland guidelines.

Accordingly, we perceive no error in regard to the trial court's decision to apply the Maryland guidelines, rather than those of Massachusetts.

## II.

Although the court did not err by failing to apply the Massachusetts guidelines, we are of the view that the court abused its discretion in reducing appellee's child support obligation on the basis of the record before it. We explain.

Under F.L. § 12–104(a), a court has discretion to modify a child support award, provided that there has been "a material change in circumstances, needs, and pecuniary condition of the parties from the time the court last had the opportunity to consider the issue." *Kierein,* 115 Md.App. at 456, 693 A.2d 1157 (citation omitted); *see Wills v. Jones,* 340 Md. 480, 489, 667 A.2d 331 (1995); *Unkle v. Unkle,* 305 Md. 587, 597, 505 A.2d 849 (1986). "[A]lthough the court has the power to modify [an Agreement] . . . it ought not do so unless

it finds (1) that the provision in question does not serve the child's best interest and (2) the proposed modification does." *Ruppert v. Fish*, 84 Md.App. 665, 581 A.2d 828 (1990). A trial court's decision to modify a child support award "will not be disturbed on appeal unless the court acted arbitrarily or its judgment was clearly erroneous." *Lieberman v. Lieberman*, 81 Md.App. 575, 595, 568 A.2d 1157 (1990).

The burden of proving a material change in circumstance is on the person seeking the modification. *See Haught v. Grieashamer*, 64 Md.App. 605, 611, 497 A.2d 1182 (1985). A change is "material" when it meets two requirements. First, it must be "relevant to the level of support a child is actually receiving or entitled to receive." *Wills*, 340 Md. at 488, 667 A.2d 331. Second, the change must be "of a sufficient magnitude to justify judicial modification of the support order." *Id.* at 489, 667 A.2d 331 (citation omitted). Thus, the court must focus upon "the alleged changes in *income or support*" that occurred after the child support award was issued. *Id.* (Emphasis added). *Wills* makes clear that "the passage of some event causing the level of support a child actually receives to diminish or increase" is relevant and material. *Id.* at 488 n. 1, 667 A.2d 331. A change "that affects the income pool used to calculate the support obligations upon which a child support award was based" is necessarily relevant. *Id.*

We recognize that the Agreement provided for the annual recalculation of child support, so that arguably the usual modification standards do not apply. Nevertheless, there were certainly material changes in circumstance here. At the time of the divorce, the father was earning $5917 per month, and paid $345.75 a week in support. Thereafter, his income increased by over $3000 per month. Both parties also remarried, and appellee now has another child.

Applying the "floor and ceiling" approach recommended in the concurring opinion in *Voishan*, 327 Md. 318, 609 A.2d 319, the circuit court found that the ceiling of monthly child support was $950. It then reduced appellee's child support

from $375 a week to $221 per week, while acknowledging that the father "offered no evidence to show how it would be in [the child's] best interest to have the level of support previously agreed and paid for her benefit to be reduced." Considering the substantial increase in appellee's earnings since the divorce, and the absence of any basis to show that the reduction was in Jocelyn's best interest, it is not clear why the court, in its discretion, determined to cut the child support so drastically. Certainly, because this is an above-guidelines case, the court was not compelled to reduce the child support to the ceiling of the Guidelines.

In *Voishan*, 327 Md. 318, 609 A.2d 319, the father argued that the presumptively correct amount of child support set forth in the guidelines for a combined monthly income of $10,000 should also apply when the monthly income exceeds $10,000. The Court disagreed, stating: "While we believe that $1040 could provide the presumptive minimum basic award for those with combined monthly incomes above $10,000, we do not believe that the legislature intended to cap the basic child support obligation at the upper limit of the schedule." *Id.* at 325, 609 A.2d 319. The Court added: "Had the legislature intended to make the highest award in the schedule the presumptive basic support obligation in all cases with combined monthly income over $10,000, it would have so stated and would not have granted the trial judge discretion in fixing those awards." *Id.* at 325–26, 609 A.2d 319. The Court continued:

Further, [the father's] proposed approach creates an artificial ceiling and itself defeats the guidelines' policy that the child enjoy a standard of living consonant with that he or she would have experienced had the parents remained married. We are unpersuaded by [the father's] argument that the legislature meant for all children whose parents earn more than $10,000 per month to have the same standard of living as those whose parents earn $10,000 per month.

Under the circumstances of this above guidelines case, where the father's income has increased substantially and there was no basis to find that a reduction in child support

was in the child's best interest, we believe the court abused its discretion in reducing child support. Therefore, we shall vacate the award of child support and remand for further proceedings.

## III.

Appellant also complains that the trial court erred when it modified child support retroactive to December 1998, thereby eliminating all arrearages. Specifically, appellant contends that both Maryland and Massachusetts law prohibit retroactive modification of child support prior to the filing of the petition requesting relief.

Appellee counters that the court had authority to modify his child support obligation retroactive to the date of filing of his original complaint, which was November 30, 1998. Alternatively, he contends that the trial court merely construed the provision of the Agreement pertaining to the annual recalculation of child support as a self-executing provision. Appellee warns that if we accept appellant's argument, "similar provisions in separation agreements calling for parties to recalculate the amounts are effectively destroyed because the parties are obliged to file suit immediately (upon non-compliance) so as not to lose any time."

We readily conclude that the court erred in making the modification retroactive to a date that preceded the filing of the current request for modification. We explain.

Appellee's first petition for modification was filed on November 30, 1998. It was dismissed, without resolution, in November 1999. The petition at issue was then filed on February 9, 2000. Family Law § 12–104(b) specifically limits retroactive modification of a child support award to the date of filing for a modification. It provides, in pertinent part: "The court may not retroactively modify a child support award prior to the date of the filing of the motion for modification." *See Langston v. Langston,* 136 Md.App. 203, 233, 764 A.2d 378 (2000), *aff'd,* 366 Md. 490, 784 A.2d 1086 (2001); *Reuter v. Reuter,* 102 Md.App. 212, 240–41, 649 A.2d 24 (1994). As the

first petition was dismissed, we know of no authority that allowed the court to reduce child support retroactive to the filing of that petition.

■ The decision to make a child support award retroactive to the filing of the second complaint is a matter reserved to the discretion of the trial court. *See Holbrook v. Cummings*, 132 Md.App. 60, 69–70, 750 A.2d 724, *cert. granted*, 360 Md. 273, 757 A.2d 809 (2001); *Tanis v. Crocker*, 110 Md.App. 559, 570–71, 678 A.2d 88 (1996); *Krikstan v. Krikstan*, 90 Md.App. 462, 472–73, 601 A.2d 1127 (1992). To be sure, the court is not required to make a modification retroactive to the date of filing of the relevant complaint. In *Krikstan*, 90 Md.App. 462, 601 A.2d 1127, appellant was awarded a downward modification of support, but the trial court did not retroactively apply the order to the date the appellant filed for modification. On appeal, the appellant urged this Court to find that F.L. § 12–104(b) required the trial court to modify the support obligation retroactive to the date of the filing of her petition. We rejected that request, stating, at 90 Md.App. at 472–73, 601 A.2d 1127:

> [T]he law does not require that awards be retroactive. It provides only that: "The court may not retroactively modify a child support award prior to the date of the filing of the motion for modification."

### IV.

■ Appellant complains that the court erred in ordering her to reimburse appellee for the overpayment of support. Because we are not satisfied that the court considered the best interests of the child in reducing the child support award, and it erred in making the reduction retroactive to December 1998, we need not address this issue at length. For the benefit of the court on remand, however, we note that appellee has "no right to restitution or recoupment following a modification of child support." *Holbrook*, 132 Md.App. at 70, 750 A.2d 724; *see Tanis*, 110 Md.App. at 570–71, 678 A.2d 88; *Krikstan*, 90 Md.App. at 473, 601 A.2d 1127.

In *Barr v. Barr,* 58 Md.App. 569, 588, 473 A.2d 1300 (1984), we explained that child support is the obligation of a parent to a child, not to the other parent. Therefore, a parent who "overpays" has no absolute right to recoupment. The concern, of course, is that such a requirement ultimately could deprive the child of benefits already received.

Massachusetts law is to the same effect. In *T.M. v. L. H.,* 50 Mass.App.Ct. 856, 742 N.E.2d 89 (2001), the Massachusetts court said:

> "Any payment or installment of support under any child support order issued by any court of this commonwealth ... shall be on or after the date it is due, a judgment by operation of law, with the full force, effect, and attributes of a judgment of this commonwealth including the ability to be enforced; shall be entitled as a judgment to full faith and credit; and shall not be subject to retroactive modification except with respect to any period during which there is a pending complaint for modification, but only from the date that notice of such complaint has been given...."

*Id.* at 92 (quoting Mass.Gen. Laws ch. 119A, § 13(a)). *See Boulter–Hedley v. Boulter,* 429 Mass. 808, 711 N.E.2d 596, 598 (1999) (noting that court has discretion in deciding whether "to give retroactive effect to a modification order...."); *Department of Revenue v. Foss,* 45 Mass.App.Ct. 452, 698 N.E.2d 1285 (1998); *Smith–Clarke v. Clarke,* 44 Mass.App.Ct. 404, 691 N.E.2d, 596 (1998) (rejecting modification of child support to a date prior to filing complaint for modification).

## V.

Appellant argues that, "either under Maryland or Massachusetts law, where appellant had not worked during the marriage except for her part-time Air Force Reserve job, and was the custodial parent," the trial court erred in finding that she was voluntarily impoverished. Appellant claims that the controlling factor is whether full-time employment is in the best interests of the child.

Appellant also challenges the court's ruling attributing $26,156 of income to her annually. She maintains that she never worked full-time during the marriage, "and except for earning $26,156.00 in 1997, her income since divorce has remained at her pre-divorce level. This one year anomaly should not be used to impute a higher income to Appellant." Moreover, she complains that "there was no showing that appellant could earn this amount of a regular basis."

In making its determination, the court stated, in part:

The Master's finding as to the father's income was unquestioned. As to the mother's income, the mother contends that the court erred in finding her "voluntarily impoverished" and therefore, imputing her 1997 income.

Whether the mother is voluntarily impoverished is a challenging legal question because, clearly, she voluntarily works for only part of the year and began this practice in 1977 prior to the parties' separation. However, since she does not pay but instead receives child support, it is not possible in accordance with most prior case law to find that she "voluntarily decrease[d] her income in order to avoid payments." E.g., *Barton v. Hirshberg*, [137 Md.App. 1, 767 A.2d 874] (3/1/01). A few cases, however, make clear that the same standard applies to a parent receiving child support payments. E.g., *Dunlap v. Fiorenza*, 128 Md.App. 357, 738 A.2d 312 (1999). Other decisions further have made clear that the parent's intent in maintaining less than her potential income may not constrain the court's imputation of potential income: "[w]hether the voluntary impoverishment is for the purpose of avoiding child support or [for some other purpose, such as] because the parent simply has chosen a frugal lifestyle for another reason, doesn't affect that parent's obligation to the child." *Goldberger v. Goldberger*, 96 Md.App. 313, at 326–327, 624 A.2d 1328 (1993) . . . .

The mother's testimony here did not specify any reason that she was unable to work more than regular reserve stint for part of each year; asked whether she had looked for other regular civilian work, she stated, without further explanation, "No, I haven't." Transcript, at p. 79. This

appears to be sufficient basis for the Master to have found the mother as "voluntarily impoverished" and to impute potential income to her under Family Law Art., sec. 12–204(b). Therefore, the Court will overrule the mother's exception on this point.

Did the Master err in attributing the mother's 1997 income to her, as opposed to her potential full-time, active military pay or her maximum private investment earnings? The undersigned does not find that he erred significantly. As in the case of *Moore v. Tseronis, supra,* a trial court properly should use caution in assuming that a particular job once available is still available. Although accepted for military service in the reserves, active duty standards may be more stringent. Moreover, as active military service may require a person to accept hazardous duties and transfers to posts far from home and family, the courts as a matter of common sense should not attempt to mandate such employment or to impute such income, unless the parent involved had recently and deliberately quit such employment. Here, the mother testified that her last full-time employment was "in 1977, [ ] prior to going into the Air Force." Transcript at pg. 76. For these reasons, the Court affirms the Master's ruling on this point that the mother apparently would be able to earn as much as she did in [1977] ($26,156), if she chose to do so, rather than "choos[ing] a lifestyle of ease" as she apparently has done.

Relying on *Barton v. Hirshberg,* 137 Md.App. 1, 767 A.2d 874 (2001), the court also imputed income to appellant based on her average investment earnings from 1997 to 1999. Based on three years of tax returns, the court found that appellant received approximately $1990 per month from her investments. Combining these figures, the court imputed to appellant $3,429.67 per month in income.

Parents have an obligation to support their children. *See Middleton,* 329 Md. at 633, 620 A.2d 1363; *Sczudlo,* 129 Md.App. at 542, 743 A.2d 268; *Goldberger v. Goldberger,* 96 Md.App. 313, 323, 624 A.2d 1328, *cert. denied,* 332 Md. 453, 632 A.2d 150 (1993). Title 12 of the Family Law Article of the

Maryland Code sets forth a comprehensive scheme with regard to parental child support.

A parent is voluntarily impoverished " 'whenever the parent has made the free and conscious choice, not compelled by factors beyond his or her control, to render himself or herself without adequate resources.' " *Digges v. Digges,* 126 Md.App. 361, 381, 730 A.2d 202, *cert. denied,* 356 Md. 17, 736 A.2d 1065 (1999)(quoting *Goldberger,* 96 Md.App. at 327, 624 A.2d 1328); *see Durkee v. Durkee,* 144 Md.App. 161, 797 A.2d 94 (2002). A parent is not excused from support because of a tolerance of or a desire for a frugal lifestyle. *Moore v. Tseronis,* 106 Md.App. 275, 282, 664 A.2d 427 (1995). Thus, the trial court must determine whether the parent has voluntarily avoided paying child support, or whether the impoverishment is voluntary. *Wills,* 340 Md. at 494, 667 A.2d 331.

In *Wills,* the Court of Appeals found "voluntary" to mean that "the action [must] be both an exercise of unconstrained free will and that the act be intentional." *Id.* at 494, 667 A.2d 331. To determine if a parent is "voluntarily impoverished," a court should consider several factors. These include:

1. the parent's current physical condition;

2. his or her respective level of education;

3. the timing of any change in employment or financial circumstances relative to the divorce proceedings;

4. the relationship of the parties prior to the divorce proceedings;

5. his or her efforts to find and retain employment;

6. his or her efforts to secure and retrain employment;

7. his or her efforts to secure retraining if that is needed;

8. his or her past work history;

9. The area in which the parties live and the status of the job market there; and

10. any other consideration presented by either party.

*John O. v. Jane O.,* 90 Md.App. 406, 422, 601 A.2d 149 (1992).

Here, the evidence indicated that appellant voluntarily chose not to pursue full-time employment, although she had no physical, mental, or emotional problems that prevented her from doing so. Nor was there a young child in the home, *see* F.L. § 12–204(b)(2)(ii), or one with special needs. Moreover, the mother's academic background suggests that she could find a full-time job. The following colloquy is pertinent:

> [APPELLANT'S ATTORNEY]: Do you recall when was the last time you held an assignment or other job or whatever that would call for approximately steady 40 hours per week?
>
> [APPELLANT]: Maybe in 1977 prior to going into the Air Force.
>
> [APPELLANT'S ATTORNEY]: Now have you tried to obtain full time employment at any time during the last year?
>
> [APPELLANT]: No, sir.
>
> [APPELLANT'S ATTORNEY]: Last two or three years?
>
> [APPELLANT]: No, sir.
>
> [APPELLANT'S ATTORNEY]: Okay. How old are you currently?
>
> [APPELLANT]: 46.

* * *

> [APPELLANT'S ATTORNEY]: Can I ask you what your undergraduate academic educational background is?
>
> [APPELLANT]: Philosophy and politics.

* * *

> [APPELLANT'S ATTORNEY]: And do you have any graduate work?
>
> [APPELLANT]: Yes sir, I do.
>
> [APPELLANT'S ATTORNEY]: Okay. And what is that?

[APPELLANT]: I have a Master's in economics and politics from Boston College. I also have—I was on my way to getting a doctorate in philosophy at Boston College.

\* \* \*

[APPELLANT'S ATTORNEY]: Okay. Could you briefly describe any specialized training which you've received in the military, educational wise in the last three years?

\* \* \*

[APPELLANT]: I'm an intelligence officer.

\* \* \*

[THE COURT]: Let me ask you a straight-up question. If you went out and got a job in the marketplace today, looked in the *Annapolis Capital* in the ad section and found a job that you were qualified for, how much could you earn?

[APPELLANT]: I don't know. There's not a bog [sic] demand sir, for intel officers.

[THE COURT]: There's a bog [sic] demand for competent, intelligent, educated people who are adapted and can take on—have organizational skills. Have you ever looked?

[APPELLANT]: No sir, I haven't.

We perceive no error in regard to the court's finding that appellant is voluntarily impoverished. In essence, appellant contends that because she did not work full-time during the marriage, and she is the custodial parent, she should not be forced to obtain full-time employment. Appellant has the option of not working outside the home. But it was altogether fair and reasonable for the court to recognize that appellant is employable, so as to warrant the court's decision to impute a reasonable wage to her.

Thus, there is no merit to appellant's claim that her "continued part-time employment status, which is unchanged from during the marriage, coupled with the presence in her home of her high school aged daughter," is a "valid reason for her to

continue to work only part[-]time." Our review of the record reflects that the court considered the evidence and the factors relevant to the issue of voluntary impoverishment, and expressly found that "[t]he mother's testimony here did not specify any reason that she was unable to work more than regular reserve stint for part of each year...."

■ Once a court determines that a parent has become voluntarily impoverished, the court must determine the party's potential income. *Dunlap*, 128 Md.App. at 364, 738 A.2d 312; *Goldberger*, 96 Md.App. at 327–28, 624 A.2d 1328; *see Wills v. Jones*, 340 Md. 480, 490, 667 A.2d 331 (1995); *Wagner v. Wagner*, 109 Md.App. 1, 42–43, 674 A.2d 1, *cert. denied*, 343 Md. 334, 681 A.2d 69 (1996); *Reuter*, 102 Md.App. at 221, 649 A.2d 24 (stating that before an award may be based on potential income, the court must hear evidence and make a specific finding that the parent was voluntarily impoverished.) The court's rulings will not be disturbed absent an abuse of discretion or erroneous factual findings. *See Reuter*, 102 Md.App. at 221, 649 A.2d 24. Section 12–201(b) of the Family Law article defines "income" as:

(1) actual income of a parent, if the parent is employed to full capacity; or

(2) *potential income of a parent,* if the parent is voluntarily impoverished.

(Emphasis added).

Further, F.L. § 12–201(f) provides:

*Potential income.*—"Potential income" means income attributed to a parent determined by the parent's employment potential and probable earnings level based on, but not limited to, recent work history, occupational qualifications, prevailing job opportunities, and earnings levels in the community.

■ In determining a party's potential income, the trial court must consider the following factors:

1. age

2. mental and physical condition

3. assets

4. educational background, special training or skills

5. prior earnings

6. efforts to find and retain employment

7. the status of the job market in the area where the parent lives

8. actual income from any source

9. any other factor bearing on the parent's ability to obtain funds for child support.

*Digges,* 126 Md.App. at 383–84, 730 A.2d 202; *Goldberger,* 96 Md.App. at 328, 624 A.2d 1328. Moreover, the court's inquiry is not limited to recent years. *Reuter,* 102 Md.App. at 225, 649 A.2d 24. When a court determines that a parent is voluntarily impoverished, it may consider any admissible evidence to ascertain potential income.

In some circumstances, a parent's past work experience will be taken into consideration in determining "potential income." To be sure, "any determination of 'potential income' must necessarily involve a degree of speculation." *Reuter,* 102 Md.App. at 223, 649 A.2d 24; *see Durkee,* 144 Md.App. at 187, 797 A.2d 94. In *In re Joshua W.,* 94 Md.App. 486, 617 A.2d 1154 (1993), an impoverished parent was a graduate student at the time of trial. Prior to his graduate studies, however, the parent had worked as a car salesman, a pastor, and a writer. Because we determined that the parent had voluntarily impoverished himself to avoid making child support payments, we declined to limit our determination of the parent's earning potential to his earnings as a graduate student.

Moreover, a parent's potential income "is not the type of fact which is capable of being 'verified,' through documentation or otherwise." *Id.* at 224, 649 A.2d 24. As long as the factual findings are not clearly erroneous, "the amount calculated is 'realistic', and the figure is not so unreasonably high or low as to amount to abuse of discretion, the court's ruling may not be disturbed." *Id.* at 223, 649 A.2d 24 (internal citation omitted).

 Although a trial court must make factual findings regarding "voluntary impoverishment" and "potential income," *Reuter,* 102 Md.App. at 221, 649 A.2d 24; *Goldberger,* 96 Md.App. at 327–28, 624 A.2d 1328, we will not disturb the findings, unless they are clearly erroneous or the court has abused its discretion. *Harbom v. Harbom,* 134 Md.App. 430, 460, 760 A.2d 272 (2000); *Schwartz v. Wagner,* 116 Md.App. 720, 724, 698 A.2d 1222 (1997); *Reuter,* 102 Md.App. at 221, 649 A.2d 24. We perceive neither error nor abuse of discretion here.

**JUDGMENT VACATED; CASE REMANDED TO THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID 50% BY APPELLANT AND 50% BY APPELLEE.**